**Sarah Anne WILLIAMS; Wayne Williams, on behalf of their minor son, John Williams,**

v.

**The SCHOOL DISTRICT OF BETHLEHEM, PA, Appellant.**

**No. 92–1650.**

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1993.

Decided July 6, 1993.

Sur Petition for Rehearing July 30, 1993.

Stuart L. Knade (Argued), Cleckner & Fearen, Harrisburg, PA, for appellant.

David Smith, Christina Rainville (Argued), Barry L. Refsin, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for appellees.

Before: SLOVITER, Chief Judge, MANSMANN and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Can high school field hockey be considered a contact sport? The district court held that it could not as a matter of law. On this ground and others, we disagree with the trial court's entry of summary judgment against

the School District, and remand because there are material fact issues to be resolved.

## I.

### Facts and Procedural History

When John Williams was fourteen years old and in ninth grade, he presented himself for the girls' field hockey team tryouts at Liberty High School, a public school in the School District of Bethlehem, Pennsylvania. He had played intramural coed field hockey when he was in eighth grade at a middle school in the School District, but the high school has only a girls' field hockey team. After the tryouts, the coach made tentative position and team assignments based on each player's abilities. John, whose skills were average, would probably have played goalie on the junior varsity team. However, after school officials learned that John and another boy had been issued uniforms, the boys were instructed that they could not play on the girls' field hockey team.[1]

John's parents, plaintiffs Sarah and Wayne Williams, filed this action in October 1990 against the School District of Bethlehem, challenging John's exclusion from the girls' field hockey team. They made claims alleging violations of title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1988), and its implementing regulation, 34 C.F.R. § 106.41 (1990); the Equal Protection and Due Process clauses of the federal Constitution, under 42 U.S.C. § 1983 (1988); and the Equal Rights Amendment to the Pennsylvania Constitution (E.R.A.), Pa. Const. art. I, § 28.

Plaintiffs sought a permanent injunction, attorneys' fees, and costs. While the litigation was pending, they reached an agreement with the School District that for the fall 1991 sports season, John, then a sophomore, would be permitted to practice with the girls' field hockey team but not to play in interscholastic games.

Based on the undisputed facts that the School District limits player participation on the field hockey team to females and that

John was not permitted to be a part of the Liberty High School team only because of that policy, the district court granted summary judgment on July 14, 1992 in favor of the plaintiffs, permanently enjoining the School District from excluding John from the Liberty High School girls' field hockey team. 799 F.Supp. 513. In holding that the School District violated title IX, the court held as a matter of law that field hockey is not a "contact sport" and that males "have previously been denied athletic opportunities," App. at 66, thereby holding inapplicable the exception in the implementing regulation for those situations. See 34 C.F.R. § 106.41(b) (1990). In sustaining the plaintiffs' federal Equal Protection claim, the district court held, inter alia, that the School District's exclusionary policy was not necessary to preserve girls' athletic opportunities and that it was not justified by the goal of rectifying past discrimination against girls in athletics.[2]

In addition, without resolving what standard of scrutiny applied, the district court held that the Pennsylvania E.R.A. was violated because its coverage is "at least as stringent" as the federal Equal Protection clause, which it had already found was violated. After the grant of the permanent injunction, John, by then a junior, rejoined the field hockey team as a full participant for the fall 1992 season.

The School District appeals. We exercise plenary review over a district court's grant of summary judgment. Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir.1990), cert. denied, 498 U.S. 1109, 1018, 112 L.Ed.2d 1100 (1991).

## II.

### Discussion

### A.

### Title IX

■ Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1988), prohibits sex discrimination in educational pro-

---

1. The second boy is not a party to this action.

2. The court did not expressly address the plaintiffs' federal Due Process claim.

grams that receive federal funding.[3] The Department of Health, Education, and Welfare (HEW) promulgated regulations implementing this general nondiscrimination principle.[4] These regulations, which appear in Part 106 of the Code of Federal Regulations, bar sex discrimination in a wide variety of education programs and facilities, including interscholastic athletics. Thereafter, HEW issued its final Policy Interpretation of the regulation applicable to athletics. *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics,* 44 Fed.Reg. 71,413 (Dec. 11, 1979) [hereinafter *Policy Interpretation*]. Although designed specifically for intercollegiate athletics, the *Policy Interpretation* specifically states that "its general principles will often apply to ... interscholastic athletic programs which are also covered by regulation," and may be used for guidance by the administrators of such programs. *Id.* at 71,-413. We accord HEW's interpretation of the regulation "appreciable deference." *Cohen v. Brown Univ.,* 991 F.2d 888, 895 (1st Cir. 1993); *see Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Subsection (a) of the applicable implementing regulation sets forth the general principle that:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic ... athletics offered by a recipient [of federal funds], and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a) (1990).

The School District does not dispute that John Williams was excluded from the Liberty High School field hockey team solely on the basis of sex. It argues instead that its policy prohibiting boys from being members of the girls' field hockey team falls within both of the exceptions set forth in subsection (b), that which provides that a team may exclude members of one sex if the sport is "a contact sport" and that which requires try-outs by members of the excluded sex only when "athletic opportunities for members of that sex have previously been limited."

The text of subsection (b) provides that notwithstanding the general requirements of subsection (a),

> a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

*Id.* § 106.41(b).

Under the regulation, a school has the general obligation to make athletic opportunities available to boys and girls. Insofar as this obligation applies to sponsorship of sports teams, the regulation expressly contemplates situations where there will be some accommodation other than making each team equally open to both sexes. As the Sixth Circuit has explained, the provisions of title IX grant flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met. *See Yellow Springs Exempted Village School Dist. Bd. of Educ. v. Ohio High School Athletic Ass'n,* 647 F.2d 651, 656 (6th Cir.1981).

---

**3.** Although the School District initially argued in the district court that title IX does not apply to athletic programs that do not themselves receive federal funds, it eventually conceded, correctly, that title IX applies whenever any part of an educational program receives federal funding,

which is the case here. *See* Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687 (1988).

**4.** This aspect of HEW's responsibilities was taken over by the Department of Education when it was created in 1979.

The regulation does not preclude a school from maintaining a team for one sex only. Indeed, the *Policy Interpretation* specifically states that "In the selection of sports, the regulation does not require institutions to integrate their teams nor to provide exactly the same choice of sports to men and women." 44 Fed.Reg. at 71,417–18. The touchstone of the regulation is to "effectively accommodate[ ] the interests and abilities of male and female athletes" so that individuals of each sex have the opportunity "to have competitive team schedules which equally reflect their abilities." *Id.* at 71,418. The regulation requires a school to permit a member of the excluded sex to try out for the single-sex team only if the athletic opportunities of the excluded sex have previously been limited. Even if they have been so limited, exclusion is permitted if the sport involved is a contact sport. The contact sport exception is thus the broadest exception recognized to the overarching goal of equal athletic opportunity.

### 1. *Contact Sport*

Because field hockey is not one of the sports expressly specified in the regulation as a contact sport, whether it can be so deemed depends on whether it is a sport "the purpose or major activity of which involves bodily contact." 34 C.F.R. § 106.41(b). Our task in reviewing the grant of summary judgment is to ascertain whether the party against whom judgment was granted created a genuine issue of material fact. *Martin v. United Way*, 829 F.2d 445, 452 (3d Cir.1987).

In support of their motion for summary judgment on the contact sport prong of the title IX inquiry, plaintiffs introduced the affidavits of four experts, each of whom concluded that field hockey is not a contact sport. In her affidavit, Lynn Ralston, Director of Development and Marketing for the Field Hockey Association of America, stated that "[f]ield hockey is technically, and according to the national and international rules which govern the play of the game, a non-contact sport." App. at 182. The affidavits of John Greer, Chairman of the Umpire Association of the Field Hockey Association of America, Richard Purser, U.S.A. National Coach of the Men's Field Hockey team, and Richard Kentwell, U.S.A. National and Olympic field hockey coach, and World Cup and Olympic field hockey umpire, included the same conclusion.[5] All of these experts relied on the rules of play for field hockey promulgated by the National Federation of State High School Associations, which provide that almost all bodily contact or threatened bodily contact between players is a violation or foul.

In opposition to plaintiffs' summary judgment motion, the School District offered the affidavit of its expert, Vonnie Gros, Head Coach of the women's interscholastic field hockey team at Ursinus College in Collegeville, Pennsylvania. Gros was also Head Coach of the United States Women's Olympic Field Hockey Team from 1977 to 1984, of the women's teams at West Chester State University for thirteen years, and of the women's teams at Princeton University for four years. She has played on women's as well as coed teams. Based on her thirty years' experience with the sport, Gros concluded that field hockey is a contact sport. Gros explained that the major activities of the sport of field hockey include running up and down the field attempting to score a goal or preventing the other team from doing so. She stated that these activities "inevitably produce and involve bodily contact," App. at 79, even though such contact is a violation of the rules of play. She concluded that field hockey is a contact sport because bodily contact "regularly occurs throughout the course of any competitive game." App. at 79.

The School District also relied on the testimony of Dominic Villani, Director of Athletics at Liberty High School, given at the hearing on a temporary restraining order. Villani stated that, based on his twenty-seven

---

5. Plaintiffs also argue on appeal that field hockey should not be considered a contact sport because it is played coed at the adult level and because there will be no bodily contact with John Williams, who plays goalie. Assuming *arguendo* that John was slated as goalie on the junior varsity team, a matter which is not free from doubt, neither argument is relevant to the threshold question whether field hockey is a contact sport for purposes of the implementing regulation.

years of experience as a physical educator and as a coach, field hockey is "definitely" a contact sport. App. at 30. Villani explained that a field hockey player is "going to use any skills and natural attributes of power, speed and strength ... to get to that ball. And because of the nature of the game, there is going to be contact. There is contact." App. at 30.

In holding that the School District had not created a factual dispute and that, as a matter of law, field hockey is not a contact sport, the district court relied on the fact that field hockey is not mentioned in the list of contact sports in the regulation, even though ice hockey is included, and that there are blanket prohibitions against bodily contact in the National Federation rules. The court dismissed the affidavit of Vonnie Gros as containing a legal conclusion. Although the court acknowledged that some bodily contact may occur during field hockey play, it found that such contact was "incidental" only. Finally, the court stated that "none of the affiants asserted that bodily contact *is* the purpose or *a major activity* of field hockey." App. at 63 (emphasis added).

All of the parties agree that the "purpose" of field hockey, unlike boxing, wrestling, or football, does not involve bodily contact. We focus, therefore, on the alternative definition. We conclude that the district court erred in granting summary judgment on the basis of the record before it.

■ We note first that the district court may have misapprehended the legal inquiry. The regulation defines a contact sport as one "the purpose or major activity of which *involves* bodily contact." There is a subtle but important distinction between whether a major activity of field hockey "involves bodily contact" (the regulation's language) or whether bodily contact "is the purpose or major activity *of* field hockey," the language used by the district court and the plaintiffs. *See* App. at 63; Appellees' Brief at 12, 13. The district court's inquiry as to the major activity suggests that bodily contact can be deemed a "major activity" of a sport only if it

is sanctioned activity. We believe that limiting the inquiry in that way would be duplicative of the "purpose" inquiry. Instead, the "major activity" prong takes into account the realities of the situation on the playing field.

Gros's affidavit and Villani's testimony raised an issue of material fact about whether a major activity of field hockey does indeed involve bodily contact. We see no reason why the district court labeled Gros's affidavit as a legal conclusion, inasmuch as Gros gave a reasoned explanation for her view in light of the realities of play, whereas the affidavits on behalf of Williams merely asserted a conclusion without any reference to actual activity during play.

It is not insignificant that the National Federation rules, introduced by the School District, require mouth protectors and shin guards, prohibit spiked shoes, require that artificial limbs be padded, and prohibit wearing jewelry. These rules suggest that bodily contact does in fact occur frequently and is expected to occur during the game.

There is very sparse precedent on this issue. In *Kleczek v. Rhode Island Interscholastic League,* 768 F.Supp. 951 (D.R.I.1991), the court denied a preliminary injunction in similar circumstances, holding that a boy who sought to play on his high school's girls' field hockey team was unlikely to succeed on the merits of his title IX or constitutional claims because even if bodily contact is incidental there may be a lot of it, and thus field hockey must be considered a contact sport for purposes of title IX. *Id.* at 955–56;[6] *cf. Gil v. New Hampshire Interscholastic Athletic Ass'n,* No. 85–E–646, slip op. at 4 (N.H.Super.Ct. filed Nov. 8, 1985) (unpublished decision) ("contact is illegal, [but] occasional forceful bodily contact and rigorous pittings of strength do occur"). Unlike the *Kleczek* court which, as a trial court, could make its own factfindings, we are not in a position to hold that field hockey must be considered a contact sport. We hold only that there is sufficient evidence on this record to preclude

---

**6.** Although the *Kleczek* court erroneously believed that title IX applies only where the athletic program itself receives federal funds, *see supra*

note 3, this was irrelevant to its decision because the court assumed that the title IX provisions applied before proceeding with the analysis.

summary judgment for plaintiffs on that issue.

### 2. *Previously Limited Athletic Opportunities*

If it is determined that field hockey is a contact sport, no other inquiry is necessary because that will be dispositive of the title IX claim. Even if a sport is not a contact sport, and there is no team for the other sex in that sport, the implementing regulation requires that members of the excluded sex be permitted to try out for a single-sex team only if their athletic opportunities have "previously been limited." 34 C.F.R. § 106.41(b). In interpreting that language, the district court considered the composition of the athletic program at Liberty High School, which mirrors the team offerings in the School District of Bethlehem overall. The court compared the number of teams for boys and those for girls, noting that as of 1989, each of the two high schools in the School District has had ten boys' teams, ten girls' teams, and two coed teams. The court found that athletic opportunities for girls have surpassed those of boys because girls are permitted to try out for all twenty-two teams whereas boys may try out for only twelve, and it thus concluded that athletic opportunities for boys have "previously been limited."

Plaintiffs argue that even if we find that athletic opportunities for boys at Liberty High School have not been limited, the School District would still be in violation of title IX because it is clear that opportunities for boys in the sport of field hockey have previously been limited. Plaintiffs thus would interpret the regulation's inquiry with respect to prior opportunities as sports-specific, in this case focusing on boys' opportunities in a traditionally female sport. This reading of the regulation language was adopted by the court in *Gomes v. Rhode Island Interscholastic League*, 469 F.Supp. 659, 664 (D.R.I.) (holding that exclusion of

boy from girls' volleyball team impermissible because boys' opportunities had been limited in that sport), *vacated as moot*, 604 F.2d 733 (1st Cir.1979).

We believe that the contrary interpretation adopted by the New York and New Hampshire courts is more persuasive. In *Mularadelis v. Haldane Central School Board*, 74 A.D.2d 248, 427 N.Y.S.2d 458, 461–64 (1980), the court looked at the phrase at issue in the context of the entire regulation. The court noted that the first clause expressly refers to a "particular sport" ("where a recipient operates or sponsors a team in a particular sport"), and the second clause uses broad and general language, defining the inquiry as whether "athletic opportunities" for members of the excluded sex have previously been limited. *Id.* If Congress had intended the inquiry into "athletic opportunities" to be limited to a "particular sport," it would have so stated, particularly since the phrase "particular sport" was used earlier in the same sentence. *Id.*[7]

This analysis convinced the Superior Court of New Hampshire, which adopted it in *Gil v. New Hampshire Interscholastic Athletic Association*, No. 85–E–646, slip op. at 31–32. We agree. As the School District argues, if the plaintiffs' construction were adopted, there could never be a situation in a non-contact sport in which a team was limited to a single sex without a corresponding team for the other sex because, by definition, the opportunities in that particular sport will be limited for the excluded sex. It would mean that boys will always be able to argue that they had previous limited athletic opportunities just because certain sports have traditionally been considered women's sports, such as field hockey. This would render nugatory the purpose of the phrase in question, which was intended to authorize single-sex teams in certain circumstances.

---

7. Moreover, HEW's interpretation, issued contemporaneously with the regulation, requires inquiry into athletic opportunities "at the institution in question" rather than in the particular sport. The final regulation was accompanied by explanations addressing comments and questions received by the agency, which stated, "If tennis is offered for men and not for women and a woman wishes to play on the tennis team, *if women's sports* have previously been limited *at the institution in question* that woman may compete for a place in the 'men's' team." *See* 40 Fed.Reg. 24,143 (June 4, 1975) (emphasis added).

We believe the district court was correct in implicitly rejecting the plaintiffs' sports-specific interpretation, and in looking instead to the overall athletic opportunities.

■ We conclude, however, that the district court applied a flawed analysis in holding as a matter of law that athletic opportunities for boys were previously limited at Liberty High School because girls have been able to try out for more teams than boys for almost two decades. The mere opportunity to try out for a team, which the district court found tipped the balance in favor of girls in the School District, is not determinative of the question of "previously limited" athletic opportunities under title IX. "Athletic opportunities" means real opportunities, not illusory ones. If, to satisfy title IX, all that the School District were required to do was to allow girls to try out for the boys' teams, then it need not have made efforts, only achieved in 1989, to equalize the numbers of sports teams offered for boys and girls.

The School District produced evidence that its decision in or about 1975 to allow girls the right to try out for all twenty-two teams did not equalize athletic opportunities between the sexes. Dominic Villani testified: "I don't believe that the fact that girls are allowed to try out for boys['] sports would help any problem of inequality. In the 27 years I have been in this business, I believe I have seen two girls that had tried out for a given sport and at best were carried on the team. It did not displace any boys." App. at 28. He concluded that "when you have girls involved in boys['] sports with respect to displacing someone, you are talking about the exception. And exceptions are very, very few." App. at 28–29.

Whether the opportunity for girls to try out for a boys' team is a realistic athletic opportunity with respect to that particular sport may turn on whether there are real and significant physical differences between boys and girls in high school. There was conflicting evidence introduced by the parties on this issue.

Plaintiffs offered evidence to show that the physical differences between boys and girls of high school age are negligible.[8] In opposition, the School District offered the affidavit of its expert, Evan G. Pattishall III, M.D., Assistant Professor of Pediatrics at the Medical School of Pennsylvania State University, who testified that high school boys on average have "greater height, weight, total body strength, upper body st[r]ength and aerobic capacity . . . [as well as] a greater quantity of lean body mass . . . [which translate into] a greater ability to create explosive and sustained muscle power and sustained physical activity." App. at 82.[9]

It follows that in determining whether boys' athletic opportunities at Liberty have previously been limited, the factfinder must decide whether meaningful physiological differences between boys and girls of high school age negate the significance of allowing girls to try out for boys' teams but not allowing the reverse.

Because the district court erred in finding dispositive the mere opportunity for girls to try out without acknowledging that the School District had created a material issue of fact as to the effect of that opportunity, we will reverse the grant of summary judgment on the plaintiffs' title IX claim and remand for further factual development on the issue whether athletic opportunities for boys have previously been limited.

■ In this connection, we must note that although title IX and the regulation apply equally to boys as well as girls, it would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges.

---

8. For example, plaintiffs introduced statistics from *Current Pediatric Diagnosis and Treatment* (10th ed. 1991), which indicates that at age 14, 95% of boys weigh between 84 and 157 pounds and are between 58.2 and 69.2 inches tall, and 95% of girls weigh between 83 and 160 pounds and are between 58.4 and 67.3 inches tall. App. at 184, 185.

9. The School District also calls to our attention other statistics in *Current Pediatric Diagnosis and Treatment* which reveal that size and weight differences between boys and girls become more pronounced through the high school years. Appellant's Brief at 29–30 (citing App. at 184, 185).

*See, e.g., Cohen,* 991 F.2d at 892. Indeed, the *Policy Interpretation* notes that "[p]articipation in intercollegiate sports has historically been emphasized for men but not women." 44 Fed.Reg. at 71,419. With specific reference to high school athletics, the *Policy Interpretation* states: "During the period from 1971–1978 ... the number of female participants in organized high school sports increased from 294,000 to 2,083,000—an increase of over 600 percent." *Id.* This growth was reflected in increased athletic participation of women on the campuses of the nation's colleges and universities. *Id.* Despite this increased participation, the *Policy Interpretation* reflects concern over the effect of prior discrimination. The *Policy Interpretation* requires continued affirmative steps, which "[i]n most cases ... will entail development of athletic programs that substantially expand opportunities for women to participate and compete at all levels." *Id.* at 71,414. Thus it is clear that the obligation of an educational institution in complying with the requirements of title IX in interscholastic athletics cannot be measured simply by comparing the number of teams available to each sex, but instead must turn on "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole." *Id.* at 71,417.

### B.

### *Federal Constitutional Claims*

In an extended discussion, the district court upheld the plaintiffs' claim that the School District's policy precluding boys from playing field hockey violated the federal Constitution's Equal Protection clause. The School District argues that the plaintiffs' constitutional claims under 42 U.S.C. § 1983 are precluded because they are based on a matter fully addressed by the comprehensive scheme in title IX.

 The Supreme Court has made clear that where a federal statute provides its own comprehensive enforcement scheme, Congress intended to foreclose a right of action under section 1983. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20–21, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981).[10] This court recently addressed the applicability of the *Sea Clammers* doctrine to cases in which plaintiff asserts a claim under title IX and the federal Constitution. In *Pfeiffer v. Marion Center Area School District,* 917 F.2d 779, 789 (3d Cir.1990), we held that the constitutional claims are "subsumed" in title IX, and that the district court, having addressed the title IX claim, properly refused to hear plaintiff's section 1983 claim. Plaintiffs argue that the *Sea Clammers* doctrine is inapplicable where an injunction is sought, but in *Pfeiffer* plaintiff also sought an injunction, and we are bound by that holding.

The district court in the instant case acknowledged that *Sea Clammers* rendered its discussion of the constitutional claims unnecessary, but chose to proceed, *inter alia,* "for the sake of completeness." App. at 67 n. 5. The court should have been guided instead by the Supreme Court's admonition that courts should exercise restraint before reaching federal constitutional claims. We will therefore not reach the constitutional issues, and will vacate the district court's judgment on the section 1983 claim.

### C.

### *Pennsylvania Equal Rights Amendment*

In granting the plaintiffs' motion for summary judgment, the district court did not

---

10. The plaintiffs argue that because the School District did not rely on *Sea Clammers* in the district court, it should be precluded from doing so here. We reject that contention because of our strong duty to decide a case on nonconstitutional grounds whenever possible. As we have previously stated, "The Supreme Court has on several occasions even applied the doctrine when the nonconstitutional ground was not presented by the parties but was first noticed by the Court itself." *Allen v. Aytch,* 535 F.2d 817, 820 (3d Cir.1976) (referring to *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963)); *see Mackey v. Mendoza–Martinez,* 362 U.S. 384, 80 S.Ct. 785, 4 L.Ed.2d 812 (1960) (per curiam); *Neese v. Southern Ry. Co.,* 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (per curiam); *Peters v. Hobby,* 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955).

separately discuss the Pennsylvania E.R.A. claim because it concluded that once it found that the School District violated the federal Equal Protection clause, the School District necessarily violated the Pennsylvania E.R.A. We will therefore review the court's federal Equal Protection analysis as if it were made in the Pennsylvania E.R.A. context, and apply the same plenary review as we have done on the other claims.

 The Pennsylvania E.R.A. provides that

[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

Pa. Const. art. I, § 28. The provision applies equally to men and to women, *see Swidzinski v. Schultz*, 342 Pa.Super. 422, 493 A.2d 93, 95–96 (1985), and, according to the Supreme Court of Pennsylvania, its purpose is

to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.

*Henderson v. Henderson*, 458 Pa. 97, 327 A.2d 60, 62 (1974) (invalidating statute permitting only women to receive alimony after divorce).

The Court has stated, "In this Commonwealth, sex may no longer be accepted as an exclusive classifying tool." *Commonwealth v. Butler*, 458 Pa. 289, 328 A.2d 851, 855 (1974) (invalidating criminal statute prohibiting minimum sentences for women while allowing them for men); *see also Hartford Accident & Indem. Co. v. Insurance Comm'r*, 505 Pa. 571, 482 A.2d 542 (1984) (striking differential insurance rates for the sexes); *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977) (abolishing "tender years" presumption used in awarding custody to mother); *Commonwealth v. Santiago*, 462 Pa. 216, 340 A.2d 440 (1975) (invalidating presumption that wife who commits crime in the presence of her husband was coerced); *Hopkins v. Blanco*, 457 Pa. 90, 320 A.2d 139 (1974) (extending to married women the right to claim damages for loss of consortium).

 Although the Supreme Court of Pennsylvania has not addressed the E.R.A. in the context of interscholastic athletics, in a thoughtful opinion the Commonwealth Court made clear that if the classification between boys and girls in connection with team sports is based on impermissible assumptions and stereotypes about the comparative characteristics or abilities of boys and girls, the E.R.A. will be violated. *Commonwealth ex rel. Packel v. Pennsylvania Interscholastic Athletic Ass'n*, 18 Pa.Cmwlth. 45, 334 A.2d 839, 843 (1975) (athletic league provision barring girls from participating in sports with boys violates E.R.A. because it embodies the stereotype that girls are generally weaker and boys generally more skilled at athletics). However, after the Commonwealth Court's decision in *Packel*, the Pennsylvania Supreme Court decided *Fischer v. Department of Public Welfare*, 509 Pa. 293, 502 A.2d 114 (1985), where it accepted the view prevailing among jurisdictions with a state E.R.A. that

the E.R.A. does not prohibit differential treatment among the sexes when, as here[,] that treatment is reasonably and genuinely based on physical characteristics unique to one sex.

*Id.* 502 A.2d at 125 (quotation omitted).

In defending the E.R.A. claim, the School District argued that because of the undeniable physical differences between girls and boys of high school age, sex was the only classification feasible for accomplishing, *inter alia*, the legitimate and substantial interest of promoting athletic opportunities for girls. As we noted in our discussion of title IX, the parties introduced conflicting evidence on the extent of physical differences between boys and girls at the high school level. Some of the evidence supports the School District's argument that the differences between the sexes increase dramatically through high school, and that by age sixteen, these differences are substantial.

The validity of the School District's policy excluding boys from the field hockey team

depends on whether there are "physical characteristics unique to [boys]" which warrant differential treatment. If there are real physical differences between high school boys and high school girls, then the sexes are "not similarly situated as they enter into most athletic endeavors," *Petrie v. Illinois High School Ass'n*, 75 Ill.App.3d 980, 31 Ill. Dec. 653, 661, 394 N.E.2d 855, 863 (1979), and exclusion based on sex may be justified, *see Bartholomew ex rel. Bartholomew v. Foster*, 115 Pa.Cmwlth. 430, 541 A.2d 393, 397 (1988) ("The only types of sexual discrimination ... permitted in this Commonwealth are those which are reasonably and genuinely based on physical characteristics unique to one sex.") (quotation omitted), *aff'd without opinion*, 522 Pa. 489, 563 A.2d 1390 (1989).

The district court found resolution of the dispute on physical differences "completely unnecessary" because there was no evidence to suggest that more than a handful of boys would ever express interest in playing field hockey. Only four girls have ever tried out for boys' teams in the School District (two for football and two for soccer), and only two boys, including John Williams, have tried out for girls' teams (field hockey).

 We believe that resolution of this factual dispute cannot be avoided. Whether boys will be interested in trying out for the field hockey team is irrelevant to the issue whether real physical differences between boys and girls justify differential treatment, in this case, the exclusion of boys from the girls' teams but not girls from the boys' teams. Under Pennsylvania law, as expressed most recently by the state's Supreme Court in *Fischer*, the legality of the School District's policy can only be resolved by deciding whether there are genuine physical differences between boys and girls or whether, instead, the policy is based on unwarranted and stereotyped assumptions about the sexes. That issue raises a fact question which precludes summary judgment.

A related dispute between the parties concerns whether permitting boys to play on the girls' teams will result in boys' eclipsing girls' athletic opportunities in the School District. Plaintiffs pointed out, as noted above, that

few students have tried out for or joined teams designated for the other sex. They also contended that, far from negatively affecting girls' athletic opportunities, allowing boys on the team will increase those opportunities because, during at least one sports season, Liberty High School had "barely" the minimum number of female players to field a team. Finally, plaintiffs asserted that because field hockey at Liberty High School is a "no cut" team, boys can never displace girls from the team.

The School District countered with the argument that if more boys are allowed on the team and permitted to play, more girls will warm the bench during the field hockey matches. It also presented the testimony of Villani that if positions on the field hockey team were open to girls and boys, "eventually boys would dominate, eliminating the opportunities of females." App. at 28. Gros agreed that male players' physical characteristics give them a significant competitive advantage over female players.

Nonetheless, the district court, again relying on the facts that few boys have expressed an interest in the sport and that no cuts are made from the Liberty High School field hockey team, found that admitting boys would not displace girls from play. In our view, the district court must resolve the factual issue as to physical differences before it can determine whether boys are likely to displace girls from the team. *Compare Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir.1977) ("[i]t takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement") *and Gil*, No. 85–E–646, slip op. at 26 ("Boys, as a class, are undoubtedly better physiologically equipped to play field hockey than are girls.") *with Attorney Gen. v. Massachusetts Interscholastic Athletic Ass'n*, 378 Mass. 342, 393 N.E.2d 284, 293 (1979) ("No doubt biological circumstance does contribute to some overall male advantages. But we think the differences are not so clear or uniform as to justify a rule in which sex is sought to be used as a kind of 'proxy' for a

functional classification."). For reasons we have already explained, this issue must be resolved at trial.

Ultimately, the validity of the classification will depend on the relationship between the classification and the government interest. Unfortunately, the Supreme Court of Pennsylvania has not yet addressed the proper level of scrutiny under the E.R.A. The district court wrote that the scrutiny must be "at least as stringent" as that under the federal Equal Protection clause. App. at 77. Plaintiffs argue that the standard must be more stringent, else there was no reason for the Pennsylvania legislature to adopt the equal rights amendment in the first place. *See Newberg v. Board of Pub. Educ.*, 26 Pa.D. & C.3d 682, 710 (Ct.Com.Pl.1983).

Although we do not agree that this is the only reason for passage of state equal rights amendments, *see* Chai R. Feldblum, Nancy Fredman Krent, & Virginia G. Watkin, *Legal Challenges to All–Female Organizations*, 21 Harv.C.R.–C.L.L.Rev. 171 (1986), there is much to commend application of heightened scrutiny to sex-based classifications. However, we are hesitant to decide this uniquely state law matter before the state's highest court has done so unless we have no other course. It is not clear that the level of scrutiny will be dispositive in this case, because the School District policy may be able to meet even the strict scrutiny standard. *See Holdman v. Olim*, 59 Haw. 346, 581 P.2d 1164, 1168 (1978).

The School District argues that the classification bears a substantial relationship to an important governmental interest, using the standard denominated as intermediate and applied in cases such as *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). The plaintiffs' argument for a strict scrutiny test would lead to the inquiry whether the School District's rule bears a necessary relationship to a "compelling state interest." *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). We do not understand the plaintiffs to argue that the School District's interest in maximizing athletic opportunities for female students would not satisfy strict scrutiny, and thus in this case we need not dwell on the difference, if any, between a "compelling" or "important" government interest.

On the other hand, we cannot avoid choosing the level of scrutiny because the disposition could turn on whether the classification bears a "necessary" relationship rather than a "substantial" relationship to the goal. Until the Pennsylvania Supreme Court has spoken on that issue, it is the better course to use the standard more favorable to the plaintiff under the state E.R.A. in light of the strong state policy to equalize opportunities for the sexes.

The School District also proffered the need to rectify past inequality in competitive interscholastic athletic opportunities for female students as a legitimate goal for its policy limiting the hockey team to girls. The district court rejected the importance of this goal on the ground that "most, if not all, of [the Liberty High School students] were not . . . in existence" at the time of the unequal past practices "in the sixties and seventies." App. at 69. This narrow view of the need to rectify past discrimination overlooks the possibility that the vestiges of longstanding discriminatory practices may still inhibit high school girls from actively pursuing athletic opportunities.

Moreover, the record shows that the discriminatory practices continued far beyond the sixties and seventies. It was not until 1989 that the School District finally had an equal number of boys' and girls' teams. We agree with the Ninth Circuit that "[t]here is no question that [redressing past discrimination against women in athletics] is a legitimate and important governmental interest." *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131–32 (9th Cir.1982) (citing *Petrie*, 31 Ill.Dec. at 660, 394 N.E.2d at 862), *cert. denied*, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); *B.C. v. Board of Educ.*, 220 N.J.Super. 214, 531 A.2d 1059, 1065 (1987).

We will therefore remand the E.R.A. claim to the district court for factfinding as to whether there are any real physical differences between boys and girls that warrant different treatment, and whether boys are

likely to dominate the school's athletic program if admitted to the girls' teams. Only then will it be possible to determine whether the School District's policy of excluding boys from girls' teams is necessary to the School District's recognized interest in preserving meaningful athletic opportunities for girls, *see Petrie*, 31 Ill.Dec. at 660–62, 394 N.E.2d at 862–64, and/or whether there is a current need to rectify the admittedly pervasive past discrimination against female high school students with respect to athletic opportunities, *see Clark*, 695 F.2d at 1131.

## III.

### *Conclusion*

In summary, the district court's order granting summary judgment for the plaintiffs will be reversed. We do not foreclose the School District from moving for summary judgment on the title IX claim based on its affidavits, thereby shifting the burden to the plaintiffs to produce evidence demonstrating a genuine issue of material fact precluding summary judgment. If the district court determines that the School District is entitled to summary judgment on the title IX claim, then our precedent would counsel dismissal of the pendent E.R.A. claim which could then be maintained in state court.

SCIRICA, Circuit Judge, concurring.

I join in the court's opinion, but write separately because I believe the rules of field hockey and conclusory opinions set forth in affidavits submitted by Williams do not create a genuine issue of material fact on whether field hockey is a contact sport. Had the school district moved for summary judgment

on the Title IX claim on this record,[1] I would have granted it.

This dispute centers on whether a "major activity" of field hockey involves bodily contact. Williams contends field hockey is not a contact sport because its rules penalize players who raise their sticks, charge, push, trip, or personally handle an opponent, or engage in "rough or dangerous play," Nat'l Fed'n of State High Sch. Ass'n, *Field Hockey Rules* 16–17, 24–25 (1990–91).[2] In support, Williams produced the affidavits of four experts, each of whom stated:

> Field hockey is *technically*, and *according to the Rules* of the Game of Hockey, a non-contact sport.

> Unlike sports like boxing, wrestling, rugby, ice hockey, football and basketball, field hockey does not involve contact as its purpose or major activity.

(emphasis added).

Whether field hockey is a contact sport cannot turn solely on the rules.[3] The focus must be on the realities of play. High school basketball rules forbid a player from "hold[ing], push[ing], trip[ping,] [ ]or imped[ing,] the progress of an opponent." Nat'l Fed'n of State High Sch. Ass'n, *Basketball Rules* at 52–53 (1990).[4] Yet basketball is a contact sport and is cited as such in 34 C.F.R. § 106.41(b). Although basketball's rules penalize charging into an opponent, collisions occur as players compete for possession of the ball. Similarly, in field hockey, players compete for possession of the ball. Collisions occur and, for purposes of § 106.-41(b), it is of little consequence that such conduct violates the rules. That contact is penalized cannot be dispositive.

---

1. Of course, once a motion for summary judgment is filed, the adverse party may respond under Fed.R.Civ.P. 56(e).

2. In rejecting the School District's argument that field hockey is a contact sport, the district court held 34 C.F.R. § 106.41(b)'s failure to include field hockey among its examples of contact sports "suggest[ed] that this sport was not recognized as a contact sport when the rule was drafted." But the textual examples in the regulation are illustrative, not inclusive. The regulation does not mention other contact sports such as lacrosse, soccer, and water polo. *See* 34 C.F.R. § 106.41(b) ("contact sports include box-

ing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact").

3. The district court held: "[i]t defies logic to conclude that bodily contact is a purpose or major activity of field hockey when a team may be penalized not only when its players or a ball hit by one of its players contacts another player, but also when such contact is threatened or likely."

4. The basketball rules are part of this record.

Williams' experts' conclusions that "field hockey does not involve contact as its ... major activity" contains another flaw. As the majority observes, at 173, there is a subtle but significant difference between asking whether "field hockey ... involve[s] contact as its major ... activity," the language used in Williams' affidavits, and asking whether "the major activity of [field hockey] involves bodily contact," the language used in § 106.41(b). Major activities of field hockey include running, advancing the ball, checking, shooting and blocking. These activities inevitably involve bodily contact.

In remarkable contrast to Williams' affiants, the School District's affiants emphasized the realities of the game. Vonnie Gros, a veteran coach and player,[5] testified:

> The major activities of the sport of field hockey includ[e] running up and down the field in order to move the ball towards the opponent's goal or to prevent the opposing team from doing so. These activities inevitably produce and involve bodily contact, as players compete at close quarters for possession or control of the ball. Although physical contact is in most cases a violation of the rules for which the official has the option of calling a penalty, such contact regularly occurs throughout the course of any competitive game. Because its major activities involve bodily contact, I consider field hockey to be a "contact sport." Field hockey certainly cannot be called a "non-contact" sport.

Similarly, Dominic Villani, Director of Athletics at Liberty High School, stated that players positioning for the ball will "bump [and] joust.... [in] a small area. So there is [sic] going to be collisions." Based on twenty-seven years of coaching experience Villani testified:

> [Y]ou know, [as a player] I have every right to that ball as the opponent does and I am going to use any skills and natural attributes of power, speed and strength ... to get to that ball. And because of the nature of the game, there is going to be contact. There is contact.

And I would make the analogy, as Title IX does, they label basketball as a contact sport. And I have observed many basketball games, and I have observed a number of field hockey games. And taken in that context, field hockey—girls' field hockey would definitely be a contact sport.

The girls' field hockey coach, Martin Romeril, also emphasized the realities of the game:

> There is contact in field hockey because you have players occupying potentially the same space. This would happen in any sport when two players want to occupy the same space, obviously, there's going to be contact so there is some contact in field hockey.

As the majority observes, the "affidavits on behalf of Williams merely asserted a conclusion without any reference to actual activity during play." At 173. In my view, this evidence fails to create a genuine issue of material fact.

SUR PETITION FOR REHEARING

July 30, 1993.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.

The petition for rehearing filed by Appellees Sarah Anne Williams and Wayne Williams in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

5. As the majority notes, Gros coached the U.S. Womens' Olympic Field Hockey Team from 1977 to 1984.