Kimberly MATTOON, et al.,
Plaintiffs, Appellants,

v.

CITY OF PITTSFIELD, et al.,
Defendants, Appellees.

No. 91–2242.

United States Court of Appeals,
First Circuit.

Heard May 7, 1992.

Decided Nov. 20, 1992.

W. Stanley Cooke, Pittsfield, Mass., for plaintiffs, appellants.

Richard J. O'Brien with whom David O. Burbank and Cain, Hibbard, Myers & Cook, Pittsfield, Mass., were on brief for defendant, appellee City of Pittsfield.

John C. Sikorski with whom Robinson, Donovan, Madden & Barry, P.C., Springfield, Mass., was on brief for defendants, appellees Krofta Engineering Corp., et al.

William Shields with whom Carol F. Liebman and Day, Berry & Howard, Boston, Mass., were on brief for defendant, appellee Metcalf & Eddy, Inc.

Jay S. Gregory with whom David J. Hatem and Posternak, Blankstein & Lund, Boston, Mass., were on brief for O'Brien & Gere, Inc.

Elizabeth W. Morse with whom John A. Wickstrom and Tashjian, Simsarian & Wickstrom, Worcester, Mass., were on brief for defendant, appellee Fisher, et al.

Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and FUSTE,[*] District Judge.

CYR, Circuit Judge.

Appellants, sixty-eight residents of Berkshire County, Massachusetts, who allegedly contracted giardiasis (otherwise known as "beaver fever") from drinking contaminated water supplied by the City of Pittsfield ("City") during November and December of 1985, brought suit against the City and various contractors and consultants for alleged violations of federal and state law.[1] Summary judgment was granted in favor of all six defendants on appellants' federal claims and the court dismissed the pendent state law claims without prejudice. We affirm.

# I

## BACKGROUND

We describe only the essential procedural background to these complex proceedings. As in any summary judgment case, we recite the relevant facts in the light most favorable to the nonmoving parties, in this case the appellants. *See, e.g., Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990).

In November 1985, the City reopened its Ashley Reservoir to supply area residents with drinking water while other City water facilities were undergoing construction. The Ashley Reservoir had not been in use since 1983. Due to a major malfunction in its chlorination system, the Ashley Reservoir became contaminated with the giardia lamblia pathogen.[2] Other area reservoirs were affected as well. By December 11, 1985, the City Health Department had received several reports of giardiasis. On December 13, a "boil water" order was issued. By the end of December several hundred cases of giardiasis had been reported. On December 23, 1985, the Ashley Reservoir was shut down, but there were sporadic reports of giardiasis as late as 1987. A new City water filtration system was placed in operation in January 1987. Although there was evidence that particles the size of the giardia lamblia pathogen would not be removed even by the new

---

[*] Of the District of Puerto Rico, sitting by designation.

[1] The five other defendants are Kroftka Engineering Corp., Lenox Institute for Research, Inc., O'Brien & Gere, Inc., Metcalf & Eddy, Inc., and Fisher & Porter Co. Kroftka and Lenox advised and assisted in the design of the City's new water filtration and treatment facilities. O'Brien & Gere supervised construction of the new facilities. Metcalf & Eddy designed the City's Ashley Reservoir chlorine system and performed other services relating to the City's water distribution equipment. Fisher & Porter sold the chlorination equipment used at the Ashley Reservoir, and performed some maintenance.

[2] The giardia lamblia inhabits the intestinal tract of the beaver.

filtration system, there was no evidence which would support an inference that any post–1985 giardiasis reports were linked to problems with the City water system.

Appellants filed their complaint in June 1988. Count I, labelled a "citizens' action" pursuant to the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq.*, demanded equitable relief and civil penalties. Count II alleged a "public nuisance" claim under federal common law and sought compensatory damages. Count III asserted a claim for damages pursuant to 42 U.S.C. § 1983. Count IV pled a breach of warranty claim pursuant to the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* Other counts asserted pendent common law claims under Massachusetts law.

In October 1989, following several months of discovery, a magistrate judge ordered all further interrogatories and requests for production served by November 3, 1989, and responses and objections served by December 8. Except for five "unusually elaborate" discovery motions filed by appellants, the magistrate judge ruled on all motions by February 9, 1990, and leave was granted to amend the complaint. The magistrate judge set May 23 as the deadline for summary judgment motions, ordered "non-expert discovery" to proceed, and stated that expert discovery relating to issues surviving the summary judgment proceedings would be allowed to proceed after the summary judgment proceedings were concluded. Thereafter, the deadline for summary judgment motions was extended several times.

On July 10, 1990, the magistrate judge ruled on appellants' five remaining motions to compel, fairly described as "well-meant but nightmarishly confusing and unhelpful." Most were denied without prejudice. At a status conference held on September 6, the magistrate judge extended the time for summary judgment until November 30 and stated that "plaintiffs may proceed with necessary discovery during the time set aside for briefing the motions for summary judgment." Plaintiffs were admonished about their obligations under Fed. R.Civ.P. 56(f) should they request further time to prepare their opposition to summary judgment.

Appellants were granted further time to respond to the motion for summary judgment, and oral argument was held in January 1991. Throughout the seven-month period between May 1990 (the original summary judgment motion deadline) and the January 1991 hearing, extensive non-expert discovery had proceeded. On January 7, 1991, the magistrate judge stayed all further discovery pending a ruling on the summary judgment motion. Expert discovery never took place. The magistrate judge filed a report and recommendation in July 1991, proposing that defendants be granted summary judgment on all federal claims. The district court approved the recommended decision in November 1991. *See* 28 U.S.C. § 636(b)(1).

Appellants challenge the order entered July 16, 1991, denying their request for further discovery pursuant to Fed.R.Civ.P. 56(f), and the grant of summary judgment on their federal claims.

## II

## DISCUSSION

The summary judgment was predicated on the grounds that (1) all other forms of federal relief are preempted by the SDWA, (2) appellants did not comply with the SDWA notice requirements, and (3) their SDWA claims are not actionable absent an ongoing violation. Our review is *de novo* and we will conclude that "[s]ummary judgment [was] warranted where the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine factual dispute and the moving party was entitled to judgment as a matter of law." *Siegal,* 921 F.2d at 17.

### A. *SDWA Preemption*

Appellants challenge the district court ruling that the SDWA preempts their section 1983 and common law nuisance claims. Relying on *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the district court ruled that the en-

forcement scheme under the SDWA, like those under the environmental statutes at issue in *Sea Clammers,*[3] is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983," *id.* at 20, 101 S.Ct. at 2626, and that the SDWA as a whole is sufficiently comprehensive to preclude federal common law remedies, *id.* at 22, 101 S.Ct. at 2627. Although their arguments are far from clear, appellants appear to contend: first, that several of their claims stem from events not regulated by the SDWA and thus that the SDWA does not preclude relief on their federal common law nuisance claims; second, that the SDWA is sufficiently unlike the statutes at issue in *Sea Clammers* to call into question the district court's reliance on *Sea Clammers;* and third, that the court erred in concluding that appellants' formulation of a section 1983 claim could not withstand SDWA preemption.

### 1. Federal Common Law

■ The federal common law nuisance claims cannot escape preemption if the enactment of the SDWA "occupied the field [of public drinking water regulation] through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Milwaukee v. Illinois,* 451 U.S. 304, 317, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981); *see also Conner v. Aerovox, Inc.,* 730 F.2d 835, 837 (1st Cir.1984) (under same standard, FWPCA held to have preempted maritime claim), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985). When the question is whether federal statutory or federal common law standards *should* control the field, we "start with the assumption" that Congress, not the courts, must decide. *Id.* 451 U.S. at 317–18, 101 S.Ct. at 1792–93. The establishment of a comprehensive regulatory program meeting the *Milwaukee v. Illinois* standard clearly indicates that Congress meant to reserve the governance of public drinking water standards to federal administrative

regulation rather than to the "often vague and indeterminate nuisance concepts and maxims of equity jurisprudence." *Milwaukee,* 451 U.S. at 317, 101 S.Ct. at 1792.

We have little hesitation in concluding that Congress occupied the field of public drinking water regulation with its enactment of the SDWA. "The purpose of the [SDWA] is to assure that water supply systems serving the public meet minimum *national standards* for protection of public health." *City of Evansville, Inc. v. Kentucky Liquid Recycling,* 604 F.2d 1008, 1016 n. 25 (7th Cir.1979) (quoting H.R.Rep. No. 93–1185, reprinted in [1974] U.S.Code Cong. & Admin.News at 6454), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980) (emphasis added). With minor exceptions, the SDWA applies "to each public water system in each State." 42 U.S.C. § 300g. The SDWA enables the Administrator of the Environmental Protection Agency ("Administrator") to "publish maximum contaminant level goals and promulgate national primary drinking water regulations." *Id.* § 300g–1(b)(1). The maximum contaminant level is to "be set at the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *Id.* § 300g–1(b)(4). The Administrator is authorized to list treatment techniques to achieve compliance with the maximum allowable contaminant levels and, in certain circumstances, to require particular treatment techniques. *Id.* § 300g–1(b)(6)–(7). The federal regulations are to be "amended whenever changes in technology, treatment techniques, and other means permit greater protection of the health of persons, but in any event such regulations shall be reviewed at least once every 3 years." *Id.* § 300g–1(b)(9). Finally, although the primary responsibility for enforcement remains with the States, the Administrator is empowered to enforce State compliance. *Id.* §§ 300g–2, 300g–3. Thus, the regulatory scheme established under the SDWA

---

**3.** At issue in *Sea Clammers* were the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. §§ 1251 *et seq.,* and the Marine Protec-

tion, Research and Sanctuaries Act ("MPRSA"), 33 U.S.C. §§ 1401 *et seq.*

evinces a clear congressional intention to entrust the regulation of public drinking water systems to an expert regulatory agency rather than the courts.[4]

Appellants claim, however, that the SDWA is not sufficiently comprehensive to meet the test in *Milwaukee v. Illinois, supra,* particularly because the EPA did not regulate giardia lamblia contamination at the time of the events which prompted the present litigation. Appellants misapprehend the nature of the comprehensiveness inquiry required under *Milwaukee v. Illinois,* which turns on " 'whether the field has been occupied, not whether it has been occupied in a particular manner.' " *Conner,* 730 F.2d at 841 (quoting *Milwaukee,* 451 U.S. at 324, 101 S.Ct. at 1796). In other words, " 'once Congress has addressed a national concern, our fundamental commitment to the separation of powers precludes the courts from scrutinizing the sufficiency of the congressional solution.' " *Id.* (quoting *People of State of Illinois v. Illinois Outboard Marine,* 680 F.2d 473, 478 (7th Cir.1982)). Provided the EPA has the statutory authority to regulate contaminants in the public drinking water supply, it is within the province of the agency, not the courts, to determine which contaminants will be regulated. The comprehensiveness of the legislative grant is not diminished, nor is the congressional intent to occupy the field rendered unclear, merely by reason of the regulatory agency's discretionary decision to exercise less than the total spectrum of regulatory power with which it was invested. *See Milwaukee,* 451 U.S. at 324–25 n. 18, 101 S.Ct. at 1796 n. 18 (complaint that "permits issued ... under [the FWPCA] do not control overflows or treated discharges in a sufficiently stringent manner, not that permits under the Act cannot deal with these subjects," does not create an interstice to be filled by federal common law).[5]

2. Section 1983

Appellants' section 1983 claims are based on two contentions. First, they contend that their rights under the SDWA were violated. Second, they assert a violation of their "constitutional right" to safe drinking water. We find merit in neither claim.

Appellants may not pursue their section 1983 claims unless Congress intended to preserve a right of action under section 1983 to redress SDWA violations. "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Sea Clammers,* 453 U.S. at 20, 101 S.Ct. at 2626 (comprehensive enforcement schemes of FWPCA and MPSRA preclude § 1983 action); *see also Garcia v. Cecos Int'l, Inc.,* 761 F.2d 76, 82–83 (1st Cir.1985) (comprehensive enforcement scheme under Resource Conservation and Recovery Act ("RCRA") precludes right of action under § 1983). Like the statutes at issue in *Sea Clammers* and *Garcia,* the SDWA establishes an elaborate enforcement scheme which confers rights of action on both the government and private citizens. The Administrator may bring a civil action to compel SDWA compliance, 42 U.S.C. § 300g–3(b), and may issue compliance orders against violators of the SDWA regulations, *id.* § 300g–3(g)(1). A civil penalty, amounting to as much as $25,000 per day, may be claimed for violations of the SDWA regulations. *See id.* §§ 300g–3(b), § 300g–3(g)(3)(A). A State is invested with primary enforcement authority only after the Administrator determines that the State has adopted regulations at

---

4. Nor are appellants aided by the savings clause in the SDWA. 42 U.S.C. § 300j–8. The Supreme Court has ruled that the almost identical savings clause in the FWPCA, 33 U.S.C. § 1365(a), does not preserve a federal common law remedy in light of the comprehensiveness of the FWPCA as a whole. *Milwaukee,* 451 U.S. at 328–29, 101 S.Ct. at 1798–99.

5. Of course, insofar as appellants might complain about any failure of the EPA to assert its regulatory power under the SDWA, we would lack jurisdiction to entertain their complaint. *See* 42 U.S.C. § 300j–7(a)(1) (claims against EPA under the SDWA must be brought in the Court of Appeals for the District of Columbia Circuit); *Western Nebraska Resources Council v. E.P.A.,* 793 F.2d 194, 199 (8th Cir.1986).

least as stringent as the federal regulations and that the State "has adopted and is implementing adequate procedures for the enforcement of such State regulations." *Id.* § 300g–2(a)(2). Moreover, private actions may be brought in the United States Court of Appeals for the District of Columbia Circuit "pertaining to the establishment of national primary drinking water regulations (including maximum contaminant level goals)." *Id.* § 300j–7. Finally, citizens may initiate enforcement proceedings against SDWA violators and against the Administrator for failure to perform any non-discretionary duty under the SDWA. *Id.* § 300j–8. As the SDWA enforcement scheme is closely analogous to other enforcement schemes found sufficiently comprehensive to evince a clear congressional intent to preempt relief under section 1983, we hold that appellants' section 1983 claims are preempted by the SDWA.[6] *Cf. Sea Clammers*, 453 U.S. at 13–14, 101 S.Ct. at 2622–23 (identifying enforcement schemes under FWPCA and MPRSA); *Garcia*, 761 F.2d at 83 (RCRA-enforcement provisions).

Finally, even assuming a "fundamental constitutional right" to safe public drinking water, it would not alter the present analysis. Comprehensive federal statutory schemes, such as the SDWA, preclude rights of action under section 1983 for alleged deprivations of constitutional rights in the field occupied by the federal statutory scheme. *See Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (Education of the Handicapped Act provides exclusive remedy even where plaintiffs assert constitutional claims); *Brown v. General Services Administration*, 425 U.S. 820, 824–25, 96 S.Ct. 1961, 1963–64, 48 L.Ed.2d 402 (1976) (§ 717 of the Civil Rights Act of 1964, as added by § 11 of the Equal Employment Opportunity Act of 1972, provides exclusive remedy for challenging racial discrimination in federal employment even though alleged discrimination "clearly violated ... the Constitution"); *Zombro v. Baltimore City Police Dept.*, 868 F.2d 1364 (4th Cir.1989) (ADEA), *cert. denied*, 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989).

## B. *The SDWA*

■ Having determined that appellants' only actionable federal claim arose under the SDWA, the district court granted summary judgment to all defendants-appellees except the City, on the ground that appellants had failed to abide by the SDWA's notice provision. We need not reach the SDWA notice issue, however, as we agree with the district court that appellants failed to demonstrate a genuine issue of material fact as to whether there was an "ongoing" violation as required by the SDWA.

The SDWA allows citizens' suits against persons "alleged *to be in violation* of any requirements prescribed by or under this subchapter ..." 42 U.S.C. § 300j–8(a)(1) (emphasis added). The Supreme Court has construed the identical language in the FWPCA, *see* 33 U.S.C. § 1365(a), as not authorizing citizens' suits absent a "continuous or intermittent violation." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 378, 98 L.Ed.2d 306 (1987). "[T]he harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Id.* at 59, 108 S.Ct. at 378.[7]

Appellants do not disagree that *Gwaltney* governs. Rather, as appellants see it, all *Gwaltney* requires is an *allegation* of "continuous or intermittent violation." As their complaint included such an allegation, appellants claim the district court improperly extended *Gwaltney* by requiring ap-

---

**6.** Nor does the SDWA savings clause, *see* 42 U.S.C. § 300j–8, avail appellants here. The Court has held that the almost identically worded FWPCA savings clause, *see* 33 U.S.C. § 1365(a), bars relief under 42 U.S.C. § 1983. *Sea Clammers*, 453 U.S. at 14–16, 101 S.Ct. at 2623–25.

**7.** As the Supreme Court noted, congressional use of the phrase "to be in violation" cannot be discounted as incidental. *Gwaltney*, 484 U.S. at 57, 108 S.Ct. at 378. The same phrase is found in other environmental statutes. *See* Clean Air Act, 42 U.S.C. § 7604; RCRA, 42 U.S.C. § 6972 (1982 ed. and Supp. III); Toxic Substances Control Act, 15 U.S.C. § 2619 (1982 ed. and Supp. IV).

pellants to provide evidence of an ongoing violation in order to avoid summary judgment on their SDWA claims. As appellants characterize it, the district court ruling caused their "initial jurisdiction to disappear."

■ Appellants' characterization of the issue reflects a fundamental misunderstanding of summary judgment procedure. Upon a properly supported motion for summary judgment, the opposing party can avoid summary judgment only by presenting evidence sufficient to establish the existence of a genuine issue of material fact as to each element essential to its claim. *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991) ("nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that *every essential element* of its claim or defense is at least trialworthy") (emphasis in original).[8] As plaintiffs-appellants produced no expert affidavits, testimony, documentation or other evidence that could lead a rational trier of fact to find an "ongoing" violation, a jurisdictional prerequisite to the maintenance of their SDWA claim, summary judgment was properly granted for all defendants.

C. *Restrictions on Discovery*

Appellants claim that the district court prematurely curtailed discovery as of January 1991, which prejudiced their ability to authenticate documents needed to oppose summary judgment. As a consequence, the magistrate judge struck the unauthenticated documents for failure to meet the requirements of Fed.R.Civ.P. 56(c). *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported

as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, *by affidavits or as otherwise provided in this rule*, must set forth specific facts showing that there is a genuine issue for trial") (emphasis added).[9] Appellants likewise object to the district court's refusal to permit expert discovery to begin until after the non-expert discovery had been concluded. The summary judgment motions were granted before expert discovery ever took place.[10]

■ Federal Rule 56(f) offers a "procedural 'escape hatch' for a party who genuinely requires additional time to marshal 'facts essential to justify [its] opposition' when confronted by a summary judgment motion." *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 988 (1st Cir.1988) (quoting *Hebert v. Wicklund*, 744 F.2d 218, 221 (1st Cir.1984)). Under Rule 56(f), "[t]he movant must (1) articulate a plausible basis for the belief that discoverable materials exist which would raise a trialworthy issue, and (2) 'demonstrate good cause for failure to have conducted the discovery earlier.'" *Price*, 931 F.2d at 164 (quoting *Paterson–Leitch*, 840 F.2d at 988). Orders denying relief under Rule 56(f) are reviewed for abuse of discretion. *Id.* at 164; *Bank One Texas, N.A. v. A.J. Warehouse, Inc.*, 968 F.2d 94, 100 (1st Cir.1992).

■ The affidavit appellants presented in support of their motion for relief under Rule 56(f) did little more than list the witnesses appellants wished to depose, and allege "[t]hat because of the complexity of

---

8. The City contended that plaintiffs' allegation of an ongoing violation was a "sham." The City supported its contention with an affidavit from the City engineer, attesting that "[t]o my knowledge, since 1986, there has [sic] been *no* documented water borne instances of giardiasis resulting from the City of Pittsfield's drinking water supply." (Emphasis in original.)

9. Appellants raise no direct challenge to the order to strike.

10. On February 9, 1990, the magistrate judge stated that expert discovery would take place

only after the completion of non-expert discovery and to the extent that summary judgment had not already been granted to any of the defendants. On January 7, 1991, the same day on which he recommended the granting of summary judgment to all defendants, the magistrate judge stayed all further discovery. The plaintiffs' request for further discovery was denied by the magistrate judge on July 16, 1991, and affirmed by the district court on November 13, 1991, the day the court granted summary judgment to the defendants.

the case and the number of parties involved, the parties have not yet completed discovery." The affidavit presented no plausible basis for asserting a belief that "specified" discoverable facts probably existed. *See Paterson–Leitch*, 840 F.2d at 988 (Rule 56(f) affidavit "should articulate some plausible basis for the party's belief that *specified* 'discoverable' material facts likely exist") (emphasis added). Nor did the affidavit demonstrate a realistic prospect that further discovery would disclose evidence sufficient to defeat the motion for summary judgment, which was granted largely on legal rather than factual grounds. Particularly, and most importantly, the Rule 56(f) affidavit merely conjectures that something might be discovered but provides no realistic basis for believing that further discovery would disclose evidence of an *ongoing SDWA violation* — without which there could be no genuine issue of material fact for trial. No document stricken by the district court under Rule 56(e) pertained to the existence of an ongoing SDWA violation. Furthermore, appellants failed to *identify* any specific fact they would expect to discover, even though they were forewarned by the magistrate judge that their reliance on Rule 56(f) relief would oblige them "to specify precisely what information they have reasonable grounds to expect would be disclosed that would generate genuine and material disputes of fact."

Finally, appellants ascribe no "cause" for their failure to complete non-expert discovery, except for the complexity of the case. The case did indeed involve complex issues. Nevertheless, more than two and one-half years elapsed between the filing of the original complaint and the granting of the motion for summary judgment, and summary judgment was not granted until more than a year after appellants were made aware that summary judgment would be sought. We believe the district court allowed appellants ample time for adequate

non-expert discovery;[11] it did not abuse its discretion by declining Rule 56(f) relief from their own lack of diligence. *See Price*, 931 F.2d at 164 (no abuse of discretion in refusing Rule 56(f) relief from plaintiff's own "lack of diligence").

*The district court judgment is affirmed.*

---

**11.** Although appellants assert that they were prejudiced by the lack of opportunity to conduct discovery relating to appellees' expert witnesses, the availability of the information needed to defeat summary judgment did not depend on appellants' ability to depose defendants' experts. Appellants were free to submit affidavits from their own experts as to the existence of an ongoing violation, *see* Fed.R.Civ.P. 56(e), yet none were forthcoming.