Richard NELSON and Edwin Jessiman, Plaintiffs,

v.

UNIVERSITY OF MAINE SYSTEM, Defendant.

Civ. No. 95–0179–B.

United States District Court, D. Maine.

Jan. 29, 1996.

George Schelling, Gross, Minsky, Mogul & Singal, Bangor, Maine, for Plaintiffs.

F. Paul Frinsko, Bernstein, Shur, Sawyer & Nelson, Portland, Maine, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiffs Richard Nelson and Edwin Jessiman, professors at the University of Maine at Mathias, sue the University of Maine System, an academic institution incorporated under the laws of Maine. Plaintiffs filed a five count complaint alleging violations of their rights under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Counts I and III), and the First Amendment to the United States Constitution and Article I § 4 of the Maine Constitution, (Counts II and IV). Nelson also sues for breach of contract (Count V).

The University of Maine System pleads several affirmative defenses, including: (1) failure to state a claim for violation of the freedom of speech and breach of contract, (2) statute of limitations, and (3) preemption. Plaintiffs move to strike these defenses under Federal Rule of Civil Procedure 12(f). Defendant moves for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Court addresses these motions below, denying Plaintiffs' Motion, and granting Defendant's Motion as to Count II, IV & V.

### I. Background

Plaintiffs Nelson and Jessiman teach at the University of Maine at Mathias. Jessiman is tenured, Nelson is not. Jessiman holds a Ph.D, and teaches in the Behavioral Sciences Department. He was first hired as an assistant professor of Psychology in 1977, before being promoted and later tenured.

Jessiman previously served as the Chairman of the Student Disciplinary Committee. Nelson, a professional historian and educator, earned two doctoral degrees, one in Education, and another in American History, and taught for ten years at the college level before coming to Machias. He has published several books and scholarly articles.

Both professors have "spoken [out] on behalf of persons whom they believed had been discriminated against on grounds of gender," and have "raised concerns" about certain University staff members as to their "discriminatory treatment both to women and those who work to advance gender equality." (Am.Compl. ¶ 1). Nelson and Jessiman claim that the University ignored their complaints, and later retaliated against them for this action. In the case of Jessiman, this retaliation came by way of the University failing to properly investigate complaints of sexual harassment lodged against him. These complaints remain in Jessiman's Equal Employment Opportunity file. Nelson claims the University retaliated against him by denying him tenure.

Jessiman and Nelson cite the following facts as relevant.

- February 11, 1991: Jessiman requested a hearing to determine whether cause existed to file formal charges and possible censure against Dr. James Lehman, an associate professor of Behavioral Sciences, for improper conduct towards faculty and students. No action was taken in response to Jessiman's request.

- May 11, 1991: Jessiman and Nelson wrote a letter to then University President Frederic A. Reynolds, documenting several incidents of improper conduct involving Dr. Lehman and Sean Casey, then Athletic Director and Men's Head Basketball Coach. President Reynolds allegedly promised to look into these matters.

- September, 1992: Nelson and Jessiman wrote to current University President Nordstrom requesting an investigation into allegations of sexual harassment and sexual discrimination.

- September 22, 1994: Jessiman forwarded to President Nordstrom a copy of his May 11, 1991 letter to Dr. Reynolds.

In the fall of 1994, President Reynolds informed Jessiman that complaints had been lodged against him for sexual harassment. These charges stem from Jessiman's allegedly improper conduct during a class he taught on sexuality. Jessiman contends he encouraged the University to investigate these allegations, offered tape recordings of the class for review, and produced the names of other students present in the class. He claims that the University never considered any of this evidence.

Professor Nelson applied for tenure in September of 1992. Nelson cites these additional facts as relevant to the alleged retaliatory denial of his tenure application.

- September 21, 1992: Nelson filed a grievance against Dr. Sloan, regarding the composition of Nelson's Tenure Peer Committee. Nelson objected to the presence of two members of the committee because he had previously requested that these particular individuals be investigated for gender discrimination and other improprieties. Nelson claims that Sloan knew of Nelson's prior complaints against these individuals, but refused to exclude them from the committee.
- November 9, 1992: the Peer Committee approved Nelson's application for tenure, over the objection of the two members of whom Nelson had complained.
- December 18, 1992: the Professional Relations Committee recommended against granting tenure to Nelson, after meeting with the former Acting President of the University and Dr. Sloan, Chair of the Social Science Division. Dr. Sloan had refused to make a formal recommendation in favor of Nelson. Nelson contends that the Committee reviewed false and misleading information regarding

Nelson's anti-discrimination activities in deciding to deny his tenure application.

- February 4, 1993: Nelson informed the Chancellor's office of the continuing practice of sexual harassment and gender discrimination at the University, and the practice of retaliation by the past two University Presidents against individuals who spoke out on these issues.
- February 12, 1993: Acting Academic Vice–President Virginia Cheney recommended to deny Nelson's tenure application after reviewing Nelson's alleged anti-discrimination activities.
- February 26, 1993: University President Nordstrom denied Nelson's application for tenure.
- March 16, 1994: Nelson filed a grievance, his second, alleging the use of false information, and non-contractual criteria in the denial of his tenure application. In hearings on May 9 and 10, 1994, arbitrator Richard G. Higgins heard these grievances. On September 5, 1994, Higgins decided that the University had violated the collective bargaining agreement in denying Nelson's tenure application.

## II. Standard

### A. Motion to Strike

Plaintiffs move to strike several of Defendant's affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f).[1] Under Rule 12(f) the Court may "order stricken from any pleading any insufficient defense." Fed.R.Civ.P. 12(f). Motions to strike, however, are disfavored, and they are rarely granted absent a showing of prejudice to the moving party. 2A *Moore's Federal Practice*, ¶ 12.21[3], 12–210—214 (1995); Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1381, 672 (1990).

---

1. Specifically Plaintiffs move to strike the affirmative defenses numbered: 1 (failure to state a claim for violation of free speech against Nelson), 2 (failure to state a claim for violation of free speech against Jessiman), 3 (failure to state a claim for breach of contract against Nelson), 6 (statute of limitations bars Jessiman's Title IX claim), 7 (statute of limitations bars Nelson's

Title IX claim), 8 (Nelson's contract claim barred by arbitrator's award) and 9 (First Amendment claims barred by Title IX). Plaintiffs also seek to strike Defendant's affirmative defenses numbered 4 and 5 (lack of standing to pursue Title IX claims), however, the Defendant has voluntarily withdrawn these defenses. (Mot. to Strike Resp. Br., 6).

Courts grant motions to strike a defense "only if the defense is legally insufficient, and presents no question of law or fact that the court must resolve." 2A *Moore's Federal Practice,* ¶ 12.21[3] at 112–210.

The Court denies Plaintiffs' Motions to Strike, as the defenses raise legitimate legal issues. *In re All Maine Asbestos Litigation,* 575 F.Supp. 1375, 1377 (D.Me.1983). The Court discusses these substantive issues more fully in dealing with the Defendant's Motion for Judgment on the Pleadings.

**B. Motion for Judgment on the Pleadings**

■■■ Under Federal Rule of Civil Procedure 12(c), either party can file for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings is appropriate when "all material allegations of fact are admitted in the pleadings and only questions of law remain." Wright and Miller, § 1367 at 510. *See Geupel v. Benson,* 704 F.Supp. 312, 313 (D.Mass.1989). The Court will not grant a 12(c) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Rivera–Gomez v. Castro,* 843 F.2d 631, 635 (1st Cir.1988). "[B]ecause the rendition of judgment in such an abrupt fashion represents an extremely early assessment of the merits of the case," the Court accepts the nonmoving party's well-pleaded facts as true, and draws all reasonable inferences in her favor. *Id.* (citing *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)). Public policy, affording each litigant a full and fair hearing on the merits, warrants against imprudent use of this motion. Wright and Miller, § 1368 at 517.

**III. Discussion**

Defendant seeks judgment on the grounds that: (1) Plaintiffs' First Amendment claims, Counts II and IV, are subsumed by their Title IX claims, (2) Plaintiff Nelson's Title IX claim, Count III is barred by the applicable statute of limitations, and (3) Nelson's contract claim, Count V, is barred by the arbi-

trator's award. The Court grants Defendant's motion as to Count II, IV and V.

**A. First Amendment Claims**

■■■ Defendant moves for Judgment on the Pleadings on Plaintiffs' First Amendment claims, Counts II and IV, on the grounds that these claims are subsumed by their Title IX claims, Counts I and III. It is well settled that when Congress legislates and creates specific and comprehensive remedies to redress an individual plaintiff's rights, Congress can preclude private enforcement of constitutional claims when the relief sought is covered under the statute's remedial scheme. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); *Smith v. Robinson,* 468 U.S. 992, 1012–13, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984). The *Sea Clammers* doctrine holds that congressional intent to preclude constitutional claims can be gleaned from the comprehensive nature of the remedial devices provided in a particular Act. *Id.*

Plaintiffs' Title IX claims subsume their constitutional claims if Title IX can be read to contain an "express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). *See, e.g., Mattoon v. City of Pittsfield,* 980 F.2d 1, 5–6 (1st Cir.1992) (enforcement scheme under Safe Drinking Water Act precludes § 1983 action); *Garcia v. Cecos Int'l, Inc.,* 761 F.2d 76, 82–83 (1st Cir.1985) (enforcement scheme under Resource Conservation and Recovery Act precludes § 1983 claim).

Title IX's enforcement scheme is comprehensive. It provides for an administrative remedy, 34 C.F.R. § 100.7, a private right of action, *Cannon v. University of Chicago,* 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560 (1979), equitable and compensatory damages, *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208 (1992), and reasonable attorney's fees under 42 U.S.C. § 1988, *Mennone v. Gordon,* 889 F.Supp. 53, 59–60 (D.Conn.

648

1995). These remedies clearly establish congressional intent to foreclose § 1983 or constitutional claims. Plaintiffs' Title IX claims thus trump the more general remedies available under the First Amendment and subsume these claims. *See, e.g., id.* (Title IX claim precludes Fourteenth Amendment claim).[2]

Plaintiffs argue that their First Amendment claims ought not to be subsumed because they address a separate harm. They argue that: "Title IX is not a free speech statute." (Obj. to Mot. for J. on Pleading, 2). The *Sea Clammers* doctrine, however, does not generally distinguish among constitutional injuries in this manner. Rather if the statutory scheme at issue redresses the injuries claimed, it precludes the constitutional claims. *See Williams v. School District of Bethlehem*, 998 F.2d 168, 176 (3d Cir.1993) (Title IX action precludes constitutional claims), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994); *Mann v. University of Cincinnati*, 864 F.Supp. 44, 48 (S.D.Ohio 1994) (same). Here, Plaintiffs' First Amendment claims arose from the same underlying facts and address the same injuries as the Title IX claims. *See Mennone*, 889 F.Supp. at 59 (constitutional claims grounded on the same underlying facts as the Title IX claims are "subsumed" within Title IX claim). The Court grants Defendant's motion as to Counts II and IV.

**B. Statute of Limitations**

▇▇▇▇▇ Next, Defendant moves for judgment as to Plaintiff Nelson's Title IX claim on the grounds that it is time barred. Like many other federal statutes Title IX does not have a statute of limitations. Therefore the Court must apply "the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Company*, 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987). The parties dispute which Maine statute of limitations applies. While the First Circuit has not determined the applicable statute of limitations for Title IX claims, analogous authority points in a single direction. *See Small v. Inhabitants of the City of Belfast*, 796 F.2d 544, 545–49 (1st Cir.1986). The Court concludes that the six-year limitations period under Maine's personal injury statute, 14 M.R.S.A. § 752, is most fitting for Title IX claims.

In *Wilson v. Garcia*, the Supreme Court held that § 1983 claims are governed by a state's personal injury statutes and not that state's civil rights statute. 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985); *Small*, 796 F.2d at 545–49.[3] The Court reasoned that § 1983 claims are better classified as personal injury claims, rather than civil rights violations, because it is unlikely that the period for personal injury actions "ever was, or ever would be, fixed in a way that would discriminate against federal claims, or

---

**2.** While the First Circuit has not applied the *Sea Clammers* test to Title IX claims, the application is straightforward. Courts in other jurisdictions have concluded that Title IX establishes a comprehensive enforcement scheme and therefore precludes § 1983 claims, and by extension constitutional claims. *Williams v. School District of Bethlehem*, 998 F.2d 168, 176 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994); *Pfeiffer v. School Bd. for Marion Center Area*, 917 F.2d 779, 789 (3d Cir.1990); *Mann v. University of Cincinnati*, 864 F.Supp. 44, 48 (S.D.Ohio 1994); *Bougher v. University of Pittsburgh*, 713 F.Supp. 139, 146 (W.D.Pa.) *aff'd on other grounds*, 882 F.2d 74 (3d Cir.1989); *Mabry v. State Board for Community Colleges*, 597 F.Supp. 1235, 1239 (D.Colo.1984), *aff'd on other grounds*, 813 F.2d 311 (10th Cir.1987), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). While Plaintiffs' First Amendment claims are not § 1983 claims, they are nonethe-

less of the same nature, rooted in federal law, and therefore the same analysis applies.

**3.** The *Wilson* Court explained the relationship between the § 1983 and personal injury statutes, by quoting:

In essence, § 1983 creates a cause of action where there has been injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person. In the broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.'

471 U.S. at 278, 105 S.Ct. at 1948 (quoting *Almond v. Kent*, 459 F.2d 200, 204 (4th Cir. 1972)). In *Wilson* Justice Brennan, writing for the majority, found that New Mexico's personal injury statute of limitations was applicable to the § 1983 claim at issue, and not the shorter New Mexico Tort Claims Act. *Id.* at 280, 105 S.Ct. at 1949.

be inconsistent with federal law in any respect." *Wilson*, 471 U.S. at 279, 105 S.Ct. at 1949. This reasoning extends to Title IX claims by way of Title VI, 42 U.S.C. § 2000d. Title IX was specifically modeled after Title VI, *see Grove City College v. Bell*, 465 U.S. 555, 566, 104 S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984); *United States v. Massachusetts Maritime Academy*, 762 F.2d 142, 148 (1st Cir. 1985) (citing *Cannon*, 441 U.S. at 694–696, 99 S.Ct. at 1956–1958), and its corresponding regulations adopt the procedures applicable to Title VI, 34 C.F.R. § 106.71.[4]

 Courts have consistently held that Title VI actions, like § 1983 actions, are governed by the state's personal injury statute of limitations. *See, e.g., Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993) (Title VI claims governed by the same statute of limitations as § 1983 claims), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 890, 127 L.Ed.2d 83 (1994); *Baker v. Board of Regents of State of Kansas*, 991 F.2d 628, 631 (10th Cir.1993) (Title VI, "a civil rights statute ... [that] is closely analogous to sections 1983 and 1981," must also be governed by the state personal injury statute of limitations); *Chambers v. Omaha Public School Dist.*, 536 F.2d 222, 225 n. 2 (8th Cir.1976) (Title VI claims are "controlled by the same considerations which inhere in ... § 1981 and § 1983 claims."). Title IX is also analogous to § 1983—"both statutes prohibit gender discrimination by state-run schools that receive federal funds." *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 617 (8th Cir. Dec. 18, 1995) (citing *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77–78 (3d Cir.1989)). Thus as with Title VI and § 1983 claims, the most appropriate statute of limitations for Title IX claims is the state's personal injury statute. *See Small*, 796 F.2d at 545 (Maine's six-year personal injury statute of limitations, 14 M.R.S.A. § 752, applies to § 1983 claims).

Defendant's assertion that the Maine Human Rights Act's two-year statute of limitations, 5 M.R.S.A. §§ 4551–4659, provides the applicable statute of limitations is misguided. Title IX claims, like their cousin § 1983 and Title IX claims, are governed by the state personal injury statute of limitations. *See, e.g., Egerdahl*, 72 F.3d 615, 617 (applying Minnesota's six-year personal injury statute of limitations, rather than the Minnesota Human Rights Act in Title IX action); *Bougher*, 882 F.2d at 77–78 (applying Pennsylvania's two-year personal injury statute of limitations to Title IX claim).

While Maine's personal injury statute provides the most appropriate state law parallel for Title IX, and Maine's personal injury statute provides for a six-year limitations period, the statute allows for certain exceptions—where "otherwise specially provided." 14 M.R.S.A. § 752. Actions against a governmental entity represent just such an exception, and fall within the Maine Tort Claims Act, 14 M.R.S.A. § 8101–8118, which carries a statute of limitations of two years, *id.* at § 8110.

Defendant's suggestion to apply the Maine Tort Claims Act is unpersuasive. In *Mueller v. Penobscot Valley Hospital*, the Supreme Judicial Court of Maine noted that while § 1983 actions are "characterized as tort actions for the purposes of determining the applicable period of limitations ... [i]t does not follow ... that this tort characterization subjects § 1983 to the limitations and procedures of tort claims acts." 538 A.2d 294, 298 n. 4 (Me.1988). In *Small v. Inhabitants of the City of Belfast*, the First Circuit expressly held that Maine's six-year statute of limitations, 14 M.R.S.A. § 752, applies to § 1983 actions. 796 F.2d at 546. The *Mueller* Court cited *Wilson* and *Small*, for the propo-

---

4. Justice Brennan, writing separately in *Grove City College v. Bell*, articulated the relationship between Title IX and Title VI:

> 'Title IX was patterned after Title VI of the Civil Rights Act of 1964.' Except for the substitution of the word 'sex' in the Title IX to replace the words 'race, color, or national origin' in Title VI, and for the limitation of Title IX to 'education' programs or activities, the

two statutes use identical language to describe their scope. The interpretation of this critical language as it already existed under Title VI is therefore crucial to an understanding of congressional intent in 1972 when Title IX was enacted using the same language.

465 U.S. at 586, 104 S.Ct. at 1228 (Brennan, J., concurring in part, dissenting in part) (citations omitted).

sition that the six-year personal injury limitations period applied to § 1983 cases. *Id.*

While state law informs as to the applicable limitations period, federal law governs the accrual period. *Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 (1st Cir. 1995); *Morris v. Government Dev. Bank,* 27 F.3d 746, 748–49 (1st Cir.1994). Under federal law the limitations period begins to run when the plaintiff knows, or has reason to know, of the injury on which the action is based. *Id.* In the instance of tenure decisions, the alleged discrimination occurs at the time the tenure decision is made and communicated to the candidate. *Delaware State College v. Ricks,* 449 U.S. 250, 258–59, 101 S.Ct. 498, 504–05, 66 L.Ed.2d 431 (1980); *see also Morris,* 27 F.3d at 749 (the rule in employment discrimination cases is that the limitations periods begins to run when the plaintiff receives "unambiguous and authoritative notice of the discriminatory act."). Subsequently related events do not toll the statute. *Id.* Professor Nelson was denied tenure, and informed of that decision, on February 26, 1993. (Am.Compl., ¶ 43). Under Maine's six-year personal injury statute of limitations, he had until February 26, 1999 to file suit. Defendant's Motion for Judgment on the Pleadings as to Counts III is denied.

## C. Contract Claims

Defendant moves for judgment on Plaintiff Nelson's Count V breach of contract claim, on the grounds that the relevant collective bargaining agreement provides for arbitration as the exclusive remedy for alleged violations of the agreement. It is well settled that when arbitration is the exclusive remedy to a contract dispute, courts will generally not intervene. *United Paperworkers International Union, AFL–CIO v. Misco,*

*Inc.,* 484 U.S. 29, 36–38, 108 S.Ct. 364, 369–71, 98 L.Ed.2d 286 (1987); *Local 900, United Paperworkers International Union v. Boise,* 683 F.Supp. 280, 284 (D.Me.1988).[5] "The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Paperworkers International,* 484 U.S. at 36, 108 S.Ct. at 369 (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960)). This Court will not upset the arbitrator's decision, and thus orders judgment for Defendant on Count V.

The dispute at issue centers around the "exclusivity" of arbitration as a remedy to contractual violations under the collective bargaining agreement. Both parties conveniently parse the language of the agreement to support their positions. Defendant claims that the arbitration provision is the exclusive remedy of the agreement. Plaintiff counters that the agreement refers to the grievance procedure, which includes arbitration, as "the best forum for resolving issues," and not the exclusive forum for resolution. (Collective Bargaining Agreement, Article 14, Section D). Read as a whole, however, the collective bargaining agreement bars Nelson's claim.

The agreement does not specifically articulate arbitration as the "exclusive remedy" for disputes. It is clear, however, that once the parties choose this path, arbitration is considered "final and binding." (Collective Bargaining Agreement, Article 14, Section D, step 5(d)).[6] Thus when the parties opt for arbitration, arbitration becomes the "exclusive remedy." While section D of Article 14 states that "employees may have rights to pursue claims or complaints through outside agencies," this presumptively relates to claims that have not been submitted for arbi-

---

**5.** Under First Circuit precedent an arbitrator's decision can be challenged if it is: "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a nonfact." *Advest, Inc. v. McCarthy,* 914 F.2d 6, 9 (1st Cir.1990) (quoting *Local 1445, United Food and Commercial Workers v. Stop and Shop Cos.,* 776 F.2d 19, 21 (1st Cir.1985)). *See Bettencourt v. Boston Edison Co.,*

560 F.2d 1045, 1049–50 (1st Cir.1977). In this case, Plaintiffs do not attack the merits of the arbitrator's decision.

**6.** The agreement reads: "The arbitrator's decision as to whether there has been a violation of this Agreement shall be final and binding on the University, the Association and any and all affected members." (Collective Bargaining Agreement, Article 14, Section D, step 5(d)).

tration. (Collective Bargaining Agreement, Article 14, Section D). Indeed, under the collective bargaining agreement complainants need not opt for arbitration at all.

 "No obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievances to arbitration only if he has contracted to do so." *Local 900*, 683 F.Supp. at 284 (quoting *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974)). Once parties do choose arbitration under the collective bargaining agreement, they must abide by the arbitrator's decision "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 9 (1st Cir.1990). *See, e.g., Owens v. Texaco*, 857 F.2d 262, 265 (5th Cir.1988) (arbitration decision in employment dispute final and binding as to contract dispute).[7] Plaintiff Nelson submitted grievances on September 21, 1992 and March 16, 1994. An arbitrator ultimately presided over these grievances and filed a final decision on September 5, 1995, resolving Nelson's complaints. Nelson does not dispute the arbitrator's findings directly, and he cannot now readdress these issues before this Court. The Court grants Defendant's Motion for Judgment on the Pleadings as to Plaintiff Nelson's contract claim, Count V.[8]

## IV. Disposition

For the above stated reasons, the Court:

(1) *DENIES* Plaintiffs' Motion to Strike;

(2) *GRANTS* Defendant's Motion for Judgment on the Pleadings as to Counts II, IV and V;

and

(3) *DENIES* Defendant's Motion for Judgment on the Pleadings as to Count III.

*SO ORDERED.*

---

7. Generally, "[w]hether the moving party is right or wrong is a question of contract interpretation for the arbitrator." *Mobil Oil v. Local 8–766 Oil, Chemical & Atomic Workers Intern. Union*, 600 F.2d 322, 326 (1st Cir.1979) (quoting *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 569, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960)).

8. While the arbitration decision bans Plaintiff Nelson's contract claim because the arbitration is final and binding, his Title IX claims survives. The arbitration is considered final and binding on issues of the contract, or contract interpretation. Plaintiff's Title IX claim does not fall within the purview of the contract.