(Slip Opinion)

# Sex Segregation in Youth Rodeo
# Events Under Title IX Regulations

The maintenance of separate boys and girls divisions in rodeo competitions offered by the South Dakota 4-H Youth Development Program is authorized by the competitive-skill exception contained in the Title IX implementing regulation at 7 C.F.R. § 15a.450(b), but not by the contact-sport exception contained in that regulation.

January 13, 2021

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF AGRICULTURE

The South Dakota 4-H Youth Development Program operates youth rodeo competitions that maintain different divisions for boys and girls, each in turn divided into junior and senior age divisions. Participants compete within their respective divisions at local or regional rodeo events, with the top finishers in the regional and local rodeos qualifying to compete in a statewide rodeo contest. Each boys and girls division offers a different, but overlapping, set of rodeo events. For instance, bull riding and steer wrestling are offered only in a boys division, while barrel racing and ribbon roping are offered only in girls divisions. At the same time, both the junior boys division and the girls divisions offer break-away roping, goat tying, and flag racing.

Your office has asked whether this youth rodeo program, which is operated by an organization that indirectly receives federal funds, violates regulations that implement Title IX of the Education Amendments of 1972.[1] Those regulations prohibit recipients of federal funds from providing athletics separately based on sex. *See* 7 C.F.R. § 15a.450(a). The regulations except from that prohibition, however, programs where the "selection" for the relevant athletic teams "is based upon competitive skill" or where "the activity involved is a contact sport." *Id.* § 15a.450(b). The question is whether the 4-H youth rodeo program satisfies either of those exceptions.

---

[1] *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Inga Bumbary-Langston, Deputy General Counsel, United States Department of Agriculture (Oct. 3, 2018) ("USDA Opinion Request").

We conclude that the maintenance of separate boys and girls divisions in the program is authorized by the competitive-skill exception, but not by the contact-sport exception. The rodeo competitions select competitors for skill because the regional and local rodeos serve as qualifying events for the statewide rodeo contest. But we do not think that these rodeos may be characterized as a "contact sport." That exception covers only sports that predominately involve, or have as a major purpose, "contact" among the competitors. The 4-H rodeo program does not involve this type of contact, and so the sport does not qualify for this exception.

## I.

Title IX provides that no person shall "be excluded from participation in," "denied the benefits of," or "subjected to discrimination" "on the basis of sex" in federally funded educational programs. 20 U.S.C. § 1681(a). Title IX's implementing regulations are contained in a Title IX "common rule" promulgated jointly by 21 agencies in 2000. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52,858 (Aug. 30, 2000). The Department of Agriculture ("USDA") adopted the common rule for its own operations in 2017. Education Programs or Activities Receiving or Benefitting from Federal Financial Assistance, 82 Fed. Reg. 46,655 (Oct. 6, 2017). The regulations provide that Title IX applies to "any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient." 7 C.F.R. § 15a.105; *see also Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX[.]").

## A.

The South Dakota 4-H Youth Development Program is an indirect recipient of federal funds. That is so by virtue of funding and services it receives from South Dakota State University ("SDSU"), a land-grant institution supported by USDA.[2] *See* Smith-Lever Act of 1914, Pub. L.

---

[2] The federal government established land-grant institutions by granting federal land to the states on condition that they create educational institutions on the property offering

No. 63-95, §§ 1–3, 38 Stat. 372, 372–74 (providing for the use of federal funds by land-grant institutions for the promotion of agricultural development and education). SDSU's State Cooperative Extension Service offers educational programs to young people throughout the state, including by supporting the 4-H program. *See* SDSU Extension, *About 4-H* (Feb. 5, 2020), https://extension.sdstate.edu/south-dakota-4-h/learn-about-sdsu-extension-4-h-program.[3] The rodeo competitions the program operates are therefore subject to the prohibitions in Title IX and its implementing regulations.

South Dakota 4-H's rodeo competitions are generally organized into four divisions, each with age and sex designations. *See* John Keimig, *South Dakota 4-H Rodeo Rules & Regulations* 4–5 (Jan. 2020) ("4-H Rodeo Rules"). The junior girls and boys divisions are for children ages 8 through 13, and the senior girls and boys divisions are for children ages 14 through 18. *Id.* at 4. Each of the four divisions offers individual events in which one contestant competes at a time.

The junior girls division consists of five individual competitions: break-away roping, goat tying, barrel racing, pole bending, and flag

practical programs like agricultural science and engineering. *See* Morrill Act of 1862, Pub. L. No. 37-130, §§ 1, 4–5, 12 Stat. 503, 503–05; Morrill Act of 1890, Pub. L. No. 51-840, § 1, 26 Stat. 417, 417–18; *see also* SDSU, *The Land-Grant Heritage of SDSU*, https://www.sdstate.edu/about-us/land-grant-heritage-sdsu (last visited Jan. 12, 2021) (describing the institution's creation as a result of the Morrill Act of 1862). The federal government continues to fund land-grant institutions. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. A, tit. I, 134 Stat. 1182 (2020); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. B, tit. I, 133 Stat. 2612, 2617 (2019).

[3] Congress first established the Cooperative Extension Service ("CES") in the Smith-Lever Act of 1914. *See id.* § 1, 38 Stat. at 372–73 (codified at 7 U.S.C. § 341) ("inaugurat[ing] . . . agricultural extension work which shall be carried on in cooperation with the United States Department of Agriculture"); SDSU Cooperative Extension Service, *The Spirit of Cooperation: Cooperative Extension Service 1982 Annual Report*, SDSU Extension Series Special 38 (1982) ("South Dakota CES Report"). Each state's CES works with the state's land grant university to transfer information and research from the university to agricultural producers, business owners, consumers, and others in the state. *See* USDA, *Extension*, https://nifa.usda.gov/extension (last visited Jan. 12, 2021). This work includes the provision of 4-H programs. South Dakota CES Report at 9. Funding for each state's CES comes from local, state, and federal appropriations, as well as private donations. *Id.* at 9, 37; *see, e.g.*, Pub. L. No. 116-260, div. A, tit. I; Pub. L. No. 116-94, div. B, tit. I, 133 Stat. at 2617.

racing. *Id.* at 4, 12–14. These are all timed events involving horseback riding. *See id.* at 12–14. In break-away roping, the contestant ropes a running calf from horseback. Goat tying tests the speed with which the contestant can ride to a goat tied to a stake, dismount, then throw and tie the goat. *See id.* at 15. In barrel racing, the rider races around three barrels arranged in a triangular configuration, and then to the finish line. In pole bending, the rider weaves through a course of six poles arranged at 21-foot intervals. *Id.* at 13. And flag racing requires each rider to deposit one flag into a bucket, retrieve a flag from a second bucket, and then race across a finish line. *Id.* at 14. The senior girls division has the same events as the junior girls division, except that instead of flag racing, it includes a ribbon roping event, in which the rider ropes a calf from horseback, dismounts, and retrieves a ribbon from the calf's ear. *See id.* at 4, 15.

The junior boys division also has break-away roping, goat tying, and flag racing. *Id.* at 4, 9–14. Junior boys compete as well in cattle riding and bareback steer riding—"rough stock" events in which an individual competitor rides a bucking animal for up to six seconds, receiving points based on riding ability. *See id.* at 9–10. The senior boys division has three rough stock events—bareback bronc riding, saddle bronc riding, and bull riding—which involve riding more powerful animals for up to eight seconds. *Id.* at 16–18. Protective equipment, including a mouthpiece and a protective vest, is mandatory for all rough stock events. *Id.* at 6. Senior boys also compete in calf roping, where a rider ropes a calf, dismounts, then throws and ties the calf; as well as in steer wrestling, where competitors—known as "doggers"—attempt to jump from horseback and wrestle a running steer to the ground.[4] *Id.* at 17–18.

In addition to the individual events offered in the four separate divisions, the senior and junior divisions both offer dally team roping, in which teams of two riders attempt to rope a steer. *See id.* at 4, 18. In contrast to the other events, dally team roping is not designated for a particular sex; instead, the 4-H rules state that the event's teams "may be both girls, both boys, or one girl and one boy." *Id.* at 4.

---

[4] The contestant in steer wrestling, or dogger, is assisted by a second rider on horseback—known as a "hazer"—who rides along the other side of the steer to keep it running in a straight line. The hazer is not considered a contestant and may not render any assistance to the dogger after the dogger has jumped from the horse. *Id.* at 18.

Although the girls and boys divisions have different events, and though each event (except for dally team roping) is designated for a specific sex, the 4-H Rodeo rules allow boys and girls to choose to compete in divisions designated for the other sex. *See* South Dakota 4-H Finals Inc., *Rodeo Entry Process* 3 (2020) ("Entry Form") (noting that competing 4-H members "are eligible to enter any offered 4-H Rodeo event regardless of [their] gender"). Entrants, however, may compete only in a single division each season. *Id.* (noting that entrants may compete in only one of the four divisions "during the 2020 4-H rodeo season"). We understand that boys and girls have in fact taken advantage of this opportunity.[5]

South Dakota 4-H rodeo has both local and state levels of competition. At the local level, a county or a similar regional entity organizes the rodeo, and any 4-H member may sign up. *See* 4-H Rodeo Rules at 4–5. To qualify for the state finals, a participant must place among the top four finishers in his or her division in that event in a regional contest, and he or she may participate in the state finals in only those events for which he or she has qualified. *See id.*[6] South Dakota 4-H rodeos also award "all-around" honors to the person in the boys division—the "all-around cowboy"—and the person in the girls division—the "all-around cowgirl"—

---

[5] *See* Editorial, *No Reason to Change 4-H Rodeo for Title IX Compliance*, Rapid City J. (May 7, 2018) ("*No Reason to Change*") ("4-H Rodeo leaders say they have accommodated rare requests from girls to participate in boys events and vice versa."); KristiForGovernor.com, Press Release, *USDA's Perdue Sides with South Dakota 4-H Rodeo Supporters for Boys and Girls Events* (Apr. 11, 2018) ("Noem Press Release") ("In 4-H rodeo in South Dakota, riding bulls and [riding] broncs . . . are called boys events, although girls are allowed to enter if they want to . . . . And some boys have chosen in recent years to compete in barrel racing, or pole bending or ribbon roping, which are called girls events.").

[6] The junior division may include participation options at the local level that do not include the possibility of qualifying for statewide competition. *See* 4-H Rodeo Rules at 10 (offering a bareback bronc riding junior competition that "is not a state-qualifying event"); Entry Form at 1 (describing an entry-level "Jr Jr division" without state-qualifying implications). Also, some local and regional rodeos are held outside of the state-qualification process. *See* John Keimig, *South Dakota 4-H Rodeo Policies & Procedures* 3 (Jan. 2020) ("4-H Rodeo Policies") (noting that some local and regional rodeos are "non-qualifying"). As we explain later, the existence of these events does not affect our overall view that the South Dakota 4-H rodeo program complies with Title IX's implementing regulations.

who accumulates the most points in a given rodeo based on his or her order of finish in each event in which he or she participates. *Id.* at 5.

## B.

In 1979, USDA's Office of General Counsel considered the application of the Title IX regulations to the 4-H rodeo program. USDA concluded that the rodeos, which it described as "sex-exclusive or sex-segregated," were subject to the general regulatory prohibition on sex discrimination, and that neither the contact-sport nor competitive-skill exception applied. *See* Memorandum for Dr. Mary Nell Greenwood, Acting Deputy Director for Extension, Science, and Education Administration, USDA, from James Michael Kelly, Assistant General Counsel, USDA, *Re: Sex-Separate Events and Awards in 4-H Rodeo Contests* at 1–2 (1979) ("1979 USDA Memorandum").

Notwithstanding that view, South Dakota 4-H rodeo continued to operate boys and girls rodeo divisions. *See* South Dakota 4-H Rodeo, *48th Annual South Dakota 4-H Finals Rodeo* (2019) ("48th Annual Rodeo") (reporting historical results for boys and girls divisions); Shaley Lensegrav, *No Changes Yet—South Dakota 4-H Rodeo Won't Have to Adjust Events for Now*, Tri-State Livestock News (May 8, 2018). Over the years, USDA received multiple requests from South Dakota public officials for reconsideration of its view. *See* Memorandum for the Office of Legal Counsel from Inga Bumbary-Langston, Deputy General Counsel, USDA, *Re: USDA Position Statement on South Dakota 4-H Rodeo Title IX Issues* at 1 (Dec. 12, 2018) ("USDA Position Statement") (describing the requests for reconsideration by former South Dakota Senator Tom Daschle and Senator John Thune, among others).

Although USDA in 2007 expressed some concern regarding the 1979 memorandum, *see id.*, USDA adhered to its earlier conclusion in 2010, *see id.*; *see also* Letter for Senator John Thune from Steven Silverman, Deputy General Counsel, USDA (Apr. 15, 2010). In 2018, Senator Thune again raised the question. USDA Opinion Request at 3–4. USDA requested our opinion and stated that it currently believes the South Dakota 4-H

rodeo should qualify for both the competitive-skill and contact-sport exceptions. *See* USDA Position Statement at 1–2, 4–7.[7]

## II.

We first address whether the 4-H youth rodeo program complies with the general prohibition of the Title IX regulation, 7 C.F.R. § 15a.450(a), against treating persons "differently" and offering sports "separately" based on sex. Title IX itself provides some flexibility when it comes to the differential treatment of the sexes in athletics. The regulation implements the statute through "a baseline prohibition against sex discrimination" in subsection (a) that sweeps more broadly than the statute itself. *Mercer v. Duke Univ.*, 190 F.3d 643, 646 (4th Cir. 1999) (Luttig, J.). This prohibition, on its face, "would require covered institutions to integrate all of their sports teams," *id.*, but the regulation then tempers that broad prohibition with "an explicit exception," *id.*, in subsection (b) for certain categories of sports. We consider first whether the 4-H youth rodeo implicates the baseline prohibition.[8]

As noted, Title IX does not proscribe all sex-based distinctions in athletic programs. Instead, it precludes sex-based "exclu[sion]" from, "deni[al]" of the benefits of, or "discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized that the term "discrimination" refers to "treating [an] individual worse than others who are similarly situated." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020); *see*

---

[7] In preparing this opinion, we also consulted with the Civil Division and Civil Rights Division of the Department of Justice and with the Office of the General Counsel of the Department of Education.

[8] The regulatory proscription is applicable to any "club . . . athletics" that are offered separately on the basis of sex. 7 C.F.R. § 15a.450(a). The 4-H rodeo program is a "club" because it involves "[a]n association formed to combine the operations or persons interested in the promotion of" youth rodeo competition. *See The Oxford English Dictionary* 366–68 (2d ed. 1989) (defining the noun "club" and listing as examples of usage such phrases as "athletic" club, "football" club, "tennis" club, and "yacht" club); *Random House Dictionary of the English Language* 391 (2d ed. 1987) ("club": "a group of persons organized for a social, literary, athletic, political, or other purpose"). The competitors are limited to 4-H members, and competitions are sponsored by regional or statewide clubs and chapters. *See* 4-H Rodeo Rules at 4 (requiring an affirmation by a 4-H club leader or program advisor that a child is in good standing to participate in 4-H rodeo contests).

*also CSX Transp. Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286–87 (2011). A recipient of federal funds that offers athletics separately does not necessarily violate this prohibition, so long as the recipient is not "excluding" members of either sex from participation in athletics, "denying the benefits" of athletics to members of either sex, or "treating [an] individual worse than others who are similarly situated."

The statute's history and structure drive home that it does not demand that sexes be treated identically, in athletics or otherwise. The statute, for example, expressly allows for sex separation in living facilities. *See* 20 U.S.C. § 1686 ("[N]othing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."). And in 1974, responding to concerns that Title IX would disrupt intercollegiate athletics, Congress directed the Secretary of Health, Education, and Welfare ("HEW") to promulgate regulations providing for "reasonable provisions considering the nature of particular sports" in applying Title IX to colleges. Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974); *see McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004). The Secretary responded by adopting regulations permitting certain forms of sex segregation, including in athletics. *See* Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134, 24,142–43 (June 4, 1975). The statute has been amended repeatedly since then, *see, e.g.*, *McCormick*, 370 F.3d at 286–87 (discussing amendments made by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 3(a), 102 Stat. 28, 28–29 (1988)), and although the matter has been the subject of some debate within Congress, *see N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–35 (1982), Congress has not disturbed these regulations. The overarching design of this scheme is not for the sexes to be treated precisely the same in every respect, but rather, as HEW explained in guidance for the application of the new regulations, to advance "the overall goal of equal opportunity in athletics." Sex Discrimination in Athletic Programs, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975). "[T]he provisions of title IX grant flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993).

Given this history, the separate boys and girls divisions in the 4-H youth rodeo program would not clearly violate the statute. No person is excluded from or denied the benefits of the 4-H youth rodeo program, since the divisions are not closed to any boy or girl based on sex, even though the events are styled girls and boys events. And the differences in the manner in which the rodeo events are offered do not necessarily treat any individual worse than others similarly situated but are instead based upon physical differences that generally exist between the sexes. For example, certain events that are offered to both sexes have separate boys and girls categories, such as junior break-away roping, goat tying, and flag racing, in an effort to maximize participation and avoid having one sex or the other dominate a single, sex-integrated version of the event. In 1979, USDA suggested that girls may have a physical advantage over boys in events involving horseback riding, owing to girls' comparatively lighter weight on average. *See* 1979 USDA Memorandum at 1. But in other events, "strength and running speed are important in successful performance; and generally boys have the advantage." *Id.* Accounting for generally different physical characteristics of boys and girls does not necessarily treat any person "worse" than another "similarly situated." *See Bostock*, 140 S. Ct. at 1740.[9]

These features of the 4-H rodeo program do not end the matter, however, because the baseline prohibition under subsection (a) of the regulation sweeps more broadly than the statute. The regulation, which is identical in all relevant respects to the one HEW promulgated in 1975, prohibits not only "exclud[ing] from participation in . . . athletics" or "discriminat[ing]

---

[9] South Dakota 4-H rodeo is little different from other athletic events in which sex may indeed make a difference. *See, e.g.*, *Conversation About Title IX Continues in the 4-H Rodeo World*, KOTA TV (Apr. 20, 2018), https://www.kotatv.com/content/news/Conversation-about-Title-IX-continues-in-the-4-H-Rodeo-world-480415473.html (explaining that integrated rodeos could preclude opportunities for boys or girls because "merging events would give certain genders an edge on the competition"); *see also id.* (reporting a female competitor's concern that "[a] boy could easily come into girls events and compete with us, but it would be really hard for a girl to go into the guys' events and tie-down rope and steer wrestle"); Noem Press Release ("Whether it is barrel racing or calf roping, the difference between the male and female competitors can create unfair advantages[.]"); *No Reason to Change* ("One of the valid reasons for an exemption [from the rule against sex segregation for 4-H rodeo] is that having boys and girls competing against each other would create an unfair competitive advantage.").

against" anyone "on the basis of sex" in athletics, but also "on the basis of sex . . . treat[ing]" a person "differently from another person," or providing "any such athletics separately on such basis." 7 C.F.R. § 15a.450(a). As the Fourth Circuit recognized, "[s]tanding alone," without subsection (b)'s exceptions, subsection (a) would require covered institutions to "integrate all of their sports teams." *Mercer*, 190 F.3d at 646. This is because a prohibition on treating persons "differently" and offering sports "separately" based on sex goes beyond separate offerings that *discriminate*—in the sense of treating an individual "worse" than those "similarly situated," *see Bostock*, 140 S. Ct. at 1740—or that formally *exclude* the members of the opposite sex.

The structure of the youth rodeo program raises questions under this baseline prohibition. In allowing both boys and girls to cross over to the others' division, 4-H rodeo does avoid "exclud[ing]" any person "from," or "den[ying]" a person "the benefits of" the program on the basis of sex. 7 C.F.R. § 15a.450(a). But the fact remains that 4-H rodeo maintains distinct "boys" and "girls" divisions, and the program thus appears to "treat" a person "differently from another person" based on sex, and "provide" athletics "separately" "on the basis of" sex. *See id.* The boys and girls divisions are each explicitly designated for one sex, and they are separate—each division offers a distinct set of rodeo events, and competitors may compete in only one division per season. *See* Entry Form at 3. Even if a boy or girl crossed over to the other division, he or she would still be competing in a separate set of events designed for the opposite sex. Separation is accomplished "on the basis of sex" if sex "played a role" in and had "a determinative influence" in creating the program's separate offerings. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *see also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020) (equating the phrases "on the basis of" and "because of"); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 185–86 (2005) (Thomas, J., dissenting) (same); *accord Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009) (holding that discrimination "because of age" in the Age Discrimination in Employment Act means that "age was the 'but for' cause of" the discrimination); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352–53 (2013) (same holding for the same language that governs Title VII retaliation actions). We accordingly believe

that the current structure of South Dakota 4-H rodeo does implicate subsection (a) of section 15a.450.

## III.

We consider then whether the 4-H rodeo program falls within either of the two exceptions from that regulatory prohibition. Subsection (b) of section 15a.450 allows recipients to offer sex-segregated "separate teams." It provides:

> *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact.

7 C.F.R. § 15a.450(b). We think that the 4-H youth rodeo program satisfies the competitive-skill exception, but not the contact-sport exception.

## A.

Because the two exceptions apply where funding recipients "operate or sponsor separate teams for members of each sex," a threshold question is whether the 4-H rodeo program is organized in the form of "teams." 7 C.F.R. § 15a.450(b). With the exception of dally team roping (and, arguably, steer wrestling), 4-H youth rodeo events are not "team" sports in the sense that competitors work together with others. Nor do rodeo participants compete against each other as members of "teams" of individual competitors. When the top finishers in local and regional rodeos go on to the state rodeo finals, for instance, they do not participate as members of "teams" from their localities or regions. *See generally* 4-H Rodeo

11

Rules; *see also, e.g.*, 48th Annual Rodeo at 8–11, 20, 26, 30 (listing individual winners from past state rodeos, but not designating any particular local or regional entity as a winner). But we do not think the exceptions apply only to sports structured as "team" competitions. Instead, the word "team" can also refer to separate groups of individuals competing against each other as individuals—here, in the statewide rodeo finals.

The term "team" does not exclusively describe individuals who compete on the same side in an athletic competition against other groups. That word also commonly refers to a set of people associated together for an activity. *See Webster's Third New International Dictionary* 2346 (2002) (defining "team" as "a number of persons associated together in work or activity"); *see also The American Heritage Dictionary of the English Language* 1786 (5th ed. 2016) ("team": "A group organized for work or activity"); *Merriam-Webster's Collegiate Dictionary* 1282 (11th ed. 2003) ("team": "a number of persons associated together in work or activity"). We can speak of a team of researchers working to cure a disease, a team of horses pulling a carriage, a rescue team searching for survivors, or the A-Team making sure a plan comes together. We think this sense of the word "team" makes it reasonable to say, in the context of club athletics, that we may similarly speak of, for example, a tennis team, or a golf team, even if the members may play and compete only with each other. In this sense, the South Dakota 4-H rodeo program indeed provides separate "teams"—various rodeo events in the boys division and a girls division at the statewide rodeo finals. The participants in the rodeo competitions are "associated" with each other in that all are competing in a related set of activities for one organization, even though most of the events involve only one individual competing at a time.

This understanding of the word "team" comports with the structure of the regulation. The exceptions contemplate that funding recipients may separately offer individual sports as well as team sports, since they list "boxing" and "wrestling" as examples of "contact sports" that may be provided separately. 7 C.F.R. § 15a.450(b). If the exception applied only when individuals compete collectively as "teammates" against other teams of competitors, then the regulation would prohibit offering individual tournaments separately by sex, even in athletic competitions in which the sexes do not appear to be similarly situated, such as boxing tournaments or wrestling tournaments. Yet the courts have not suggested that

holding such tournaments separately violates these regulations. *See Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, 816 F. Supp. 2d 869, 927 (E.D. Cal. 2011) (applying the contact-sport exception to allegations that the defendant, among other things, had failed to offer equal athletic opportunities in sponsoring a wrestling tournament); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) (observing in the context of a girl's attempt to join a boxing tournament that "regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams").[10] As we have already noted, Title IX does not prohibit sex segregation of sports in which the sexes are not similarly situated; rather, Congress specifically directed that the statute be administered in a way that makes "reasonable provisions considering the nature of particular sports." *See* Education Amendments of 1974 § 844, 88 Stat. at 612; *see also Kelley v. Bd. of Trustees*, 35 F.3d 265, 270 (7th Cir. 1994) (describing Congress as directing that the scheme be administered to account for the "unique set of problems" presented by Title IX's application to athletics). The regulation should be read in harmony with that directive. *See, e.g.*, *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 401–02 (2008) (interpreting regulation in accordance with the "structure and purposes" of the statute it implements). Reading the regulation to bar all sex-segregated individual competitions would not honor that statutory mandate. By contrast, reading the regulation to exempt both athletics organized by individual competitions as well as by group competitions gives funding recipients the congressionally intended flexibility to offer sports separately where the sexes may not be similarly situated.

This interpretation is consistent with the history of the regulation. After HEW first promulgated this regulation in 1975, that agency issued guid-

---

[10] Although the opinions do not clearly specify that these tournaments involved individual competitions, other sources indicate that the tournaments were individual ones. *See* Fresno State University, *Wrestlers Back in Shape at Aggie Open* (Jan. 17, 2004), https://gobulldogs.com/news/2004/1/17/Wrestlers_Back_in_Shape_at_Aggie_Open.aspx (describing the individualized structure of the relevant tournament); U.S. Air Force Academy Wrestling, *Air Force Claims Three Titles at Aggie Wrestling Open* (Jan. 8, 2001), https://goairforcefalcons.com/news/2001/1/8/Air_Force_Claims_Three_Titles_at_Aggie_Wrestling_Open.aspx (same); *Boxing*, Lansing State J., Feb. 9, 1982, at C3, https://www.newspapers.com/clip/6976080/lansing-state-journal/ (reporting the results of the tournament).

ance making clear that the "separate teams" exception refers not to the team-based organization of a sport, but rather "to the manner in which a given sports activity is to be offered." 40 Fed. Reg. at 52,656. The guidance noted additionally that "[c]ontact sports and sports for which teams are chosen by competition may be offered either separately or on a unitary basis." *Id.* A similar suggestion appears in policy guidance issued in 1979 by HEW, which characterized the exception as applying generally "[i]n the selection of sports." Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413, 71,417 (Dec. 11, 1979). Many funding recipients, as a matter of common practice, will likely offer athletics through sports that place one team in competition against other teams. But the focus of the guidance is on whether the organization's offerings—however they are structured—are effectively providing athletic opportunities for both sexes. *See* 40 Fed. Reg. at 52,656 (describing the "overall goal of equal opportunity in athletics").

We think that these guidance documents correctly interpret the regulatory exceptions. The exceptions in the current regulations are identical in all relevant respects to the exceptions interpreted by HEW's 1975 guidance and 1979 policy statement. *See* 40 Fed. Reg. at 24,142–43 (original regulations); 65 Fed. Reg. at 52,872–73 (promulgation of the current Title IX common rule); 82 Fed. Reg. at 46,664 (adoption of the common rule, including the athletics provisions, for USDA). And in adopting the common rule in which that language appears today, the agencies did not intend to modify the application of the athletics regulations as HEW had previously interpreted them. *See* 65 Fed. Reg. at 52,862 (explaining that, because "collegiate athletic programs are already covered by the Department of Education's Title IX regulations, and have been since 1975," athletic programs would "not be affected by [the] common rule"); *id.* at 52,859 (noting that the common rule was intended, among other things, to "maintain[] consistency of interpretation of regulations enforcing Title IX"). Thus, even when an organization like South Dakota 4-H offers a sport that does not involve teams competing against each other, we think that the regulatory exception still applies to permit separate athletic offerings where the sport in question is a competitive or contact sport.

Finally, this interpretation is consonant with the purpose of the statute: to ensure that members of both sexes have equal opportunity to compete

in athletics. Offering athletics separately prevents members of one sex from dominating athletic events based on an inherent physical advantage. *See, e.g.*, *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657–58 (6th Cir. 1981) (noting that contrary regulations requiring sex integration regardless of skill or other considerations "might result in male dominance of all teams and cause a return to pre-Title IX conditions, a result completely at variance with the statute's purpose"); *cf. O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, Circuit Justice) (observing in the equal-protection context that "[w]ithout a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events"). Yet the potential for such inherent advantages is not limited to sports organized as "teams" such as basketball and soccer, or sports involving "teams" of individuals that compete collectively against other "teams." That potential exists in wholly individual sports as well. We thus think that the regulation does not require integration of all sports where the competitors compete as individuals, but instead allows both group and individual sports to be offered separately to each sex, so long as the teams of competitors satisfy the competitive-skill or contact-sport exception, and the recipient otherwise "provide[s] equal athletic opportunity for members of both sexes." 7 C.F.R. § 15a.450(c).

**B.**

Having concluded that the 4-H youth rodeos involve the operation of "teams" within the meaning of the regulation, we next consider whether the competitive-skill exception applies. This exception permits the operation and sponsorship of "separate teams" if "selection for such teams is based upon competitive skill." 7 C.F.R. § 15a.450(b). South Dakota 4-H rodeo satisfies this exception. Local or regional 4-H rodeo participants compete for one of that rodeo's four spots in each state finals event and are selected to the state finals based on their performance. *See* 4-H Rodeo Rules at 4–5. Those groups constitute the statewide-finals "teams," which therefore may permissibly be operated and sponsored in separate boys and girls divisions. *See* 7 C.F.R. § 15a.450(b).

The process of selecting boys and girls for those teams is clearly based upon "competitive skill." Similar to tryouts for more traditional sports teams, boys and girls in each local or regional rodeo division compete for selection to the groups of boys and girls who will participate in the statewide rodeo events. The local and regional competitions involve a choice of certain competitors over others based on skill in a given event. The statewide rodeo divisions thus may permissibly be sex-segregated.

It follows that the local and regional rodeo divisions may be sex-segregated as well, even though they are open to all without regard to skill. *See* 4-H Rodeo Rules at 4. The events in the local and regional rodeos may be offered separately based on sex because the regulatory exception allows a funding recipient to "operate or sponsor" separate teams. 7 C.F.R. § 15a.450(b). One way to "operate" or "sponsor" a team is to hold a tryout competition to select its members. Here, the local and regional rodeos are tryouts for, and therefore part of operating and sponsoring, the statewide-finals teams. The regulation, indeed, contemplates the possibility of tryout competitions in specifying that, "where a recipient operates or sponsors a team in a particular sport for members of one sex, but operates or sponsors no such team for members of the other sex," the "members of the excluded sex" in some instances "must *be allowed to try out for the team offered*." *Id.* (emphasis added).[11] This result is consistent with the purpose of providing equal athletic opportunity. If the local and regional rodeos could not be sex-segregated, then the statewide-finals events likely would be dominated by one sex or the other. Boys, for example, might dominate events in which competitors are advantaged by physical strength, like rough stock events; and girls could dominate in other events, such as those involving racing on horseback. *See* 1979 USDA Memorandum at 1; *see also supra* note 9. The regulation therefore permits sex-segregation in the local and regional rodeos.

---

[11] In particular, the members of the excluded sex must be allowed to try out for the single-sex team if (1) "athletic opportunities for members of that sex have previously been limited," and (2) the sport is not a "contact sport." *Id.* This requirement might be implicated by the fact that barrel racing, pole bending, and ribbon roping are offered only in the girls divisions, while rough stock events are offered only in the boys divisions. But even if the rodeo program had "previously . . . limited" opportunities for either sex, it would still satisfy this "tryout" requirement because girls and boys are eligible to enter all rodeo events, even those designated for the opposite sex.

There is a further wrinkle, however, because not all those rodeo events are tryouts for the statewide rodeo. Some local and regional rodeos operate a "Jr Jr division," which involves separate competitions that mirror the junior rodeo events, but do not qualify participants for the statewide events. *See, e.g.*, Entry Form at 1. And some of those rodeos (or some events at certain rodeos) are not part of the state-qualification process at all. *See, e.g.*, 4-H Rodeo Polices at 3; 4-H Rodeo Rules at 10 (describing the optional bareback bronc riding event in the junior boys division). Because competition in non-qualifying rodeo events does not involve a narrowing selection process to compete in the state finals, these events do not fit as naturally into the regulatory exception as do the events in which participants may qualify for the state finals.

Still, we think that even the non-qualifying events may reasonably be viewed as part of the "operation" of the South Dakota 4-H rodeo state finals "teams." The non-qualifying competitions are opportunities for younger competitors to train and prepare for eventually competing in events that do potentially qualify participants for the teams at the state level. A funding recipient may provide noncompetitive offerings that are reasonably incidental to the competitive elements of the sport in question. Many colleges and high schools, for example, commonly prepare their student-athletes for competition on a single-sex team through scrimmages, open houses, or preseason matches that are unrelated to the team's initial tryout process and that have no impact on the standing of the team in interscholastic competition. Yet we are aware of no administrative guidance or enforcement history suggesting that such incidental operations must be sex-integrated. By the same reasoning, if South Dakota 4-H may operate separate boys and girls teams at the state level of competition, it may also operate sex-segregated events designed to prepare competitors for the rigors of reaching and participating in that level of competition. We think therefore that the regulation does not require that non-qualifying rodeo events be sex-integrated.

## C.

We next address the contact-sport exception. The regulation permits operating "separate teams" where the sport "is a contact sport." 7 C.F.R. § 15a.450(b). The regulation goes on to elaborate that "contact sports

include boxing, wrestling, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact." *Id*. Because rodeo does not appear on that list, the question is whether rodeo is some "other sport[] the purpose or major activity of which involves bodily contact." We think it is not.

By "bodily contact," we read the regulation to require purposeful and frequent physical contact among the sport's competitors, not contact that may result if a competitor's body hits the ground, a stationary object, an animal, or, incidentally, another competitor. The regulation exempts "contact sports," a term that ordinarily refers to sports involving routine contact between competitors. *See, e.g.*, *American Heritage Dictionary* at 396 ("contact sport": "A sport, such as football or hockey, that involves physical contact *between players* as part of normal play." (emphasis added)); *Random House Dictionary* at 438 ("[A]ny sport in which physical contact *between players* is an accepted part of play, as football, boxing, or hockey." (emphasis added)).[12] Moreover, the phrase "bodily contact" is preceded by a list of examples of "contact sports," all of which involve "bodily contact" occurring among the sport's competitors themselves.[13] Where "general words follow specific words in a statutory enu-

_____

[12] *See also Macmillan Dictionary*, https://www.macmillandictionary.com/dictionary/british/contact-sport?q=contact+sports (last visited Jan. 12, 2021) ("contact sport": "a sport such as rugby, boxing, or American football in which the players have strong or violent physical contact *with each other*" (emphasis added)); *Longman Dictionary*, https://www.ldoceonline.com/dictionary/contact-sport (last visited Jan. 12, 2021) ("a sport . . . in which players have physical contact *with each other*" (emphasis added)).

[13] *See, e.g.*, USA Boxing, *National Rulebook* 18–19 (2017) (providing that scores depend on the number of "quality blows" struck against an opponent); NCAA, *Wrestling 2019–20 and 2020–21 Rules Book* 14 (2019), http://www.ncaapublications.com/productdownloads/WR20.pdf ("While wrestling, the match shall be stopped whenever contact is *not* maintained." (emphasis added)); World Rugby, *Laws of the Game: Rugby Union* 17, 21 (2018) (describing aspects of the game in which players "[g]rasp[] another player's body" or are otherwise "in physical contact" with each other); NCAA, *Ice Hockey 2018–19 and 2019–20 Rules and Interpretations* 9 (2019), http://www.ncaapublications.com/productdownloads/IH20_20190826.pdf (explaining that the contact inherent in the game requires diligence about safety risks and clarifying the sorts of "[a]llowable [c]ontact" in women's ice hockey); NCAA, *Football 2019 Rules Book* 28, 39 (2019), http://www.ncaapublications.com/productdownloads/FR19.pdf (describing football-related activities such as "blocking" and "tackling," which necessarily involve contact); NCAA, *Men's Basketball 2019–20 Rules Book* 48 (2019), http://www.

meration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (brackets omitted). Hence, the catch-all phrase "other sport[] the purpose of major activity of which involves bodily contact" is best read to mean, like all the other sports on that list, sports involving "bodily contact" occurring primarily between the competitors themselves.

The events offered in the 4-H youth rodeo program are not contact sports in this sense. First, in no rodeo event is the "purpose" of the event for two people to come into physical contact with each other. Two competitors are involved in dally team roping, but the purpose of the event involves working together to rope a calf while on horseback. Steer wrestling also involves participation between two people on horseback—the hazer attempts to keep the steer close to the dogger—but the purpose is to help the dogger bring the steer to the ground, not to contact the other person. *See* 4-H Rodeo Rules at 17–18. Some events also involve other persons on the playing field with the competitors, such as in rough stock events, where safety personnel attempt to protect the rider after he falls off the animal. *See* USDA Position Statement at 5. But any such human contact is incidental to the event and outside the ordinary course of play.

Second, we do not understand that, "tak[ing] into account the realities of the situation on the playing field," incidental human-to-human bodily contact occurs so regularly in these rodeos that the contact might constitute a "major activity" of the sport. *See Williams*, 998 F.2d at 173 (concluding that field hockey is similar to a "contact sport" in part because the game's formal rules sanction "bodily contact" as a regular occurrence within the sport); *see also Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 955–56 (D.R.I. 1991) (reviewing the frequency of bodily contact in field hockey and the allowance for such contact within official game rules when evaluating whether field hockey is a "contact sport"). USDA describes only "anecdotal" evidence of contact with safety personnel, USDA Opinion Request at 4, and the other principal types of contact in rodeo—contact with animals and contact with the ground, *see* 4-H Rodeo Rules at 13; Stephen Rice, *Medical Conditions Affecting Sports*

---

ncaapublications.com/productdownloads/BR20.pdf (explaining that certain contact between players is "generally accepted as . . . occur[ring] in a basketball game").

*Participation*, 121 Am. Acad. of Pediatrics 841 (2008) ("*Medical Conditions*")—do not involve contact with other competitors.

Finally, we do not agree that rodeo is a "contact sport" simply because some of its events involve wearing safety equipment to decrease the "risk of an acute injury." *See Medical Conditions* at 841–42; *see also* USDA Position Statement at 5 (relying in part on the "serious risks of injuries" identified by the American Academy of Pediatrics to support application of the contact-sport exception). Application of the regulation turns on whether the sport in question involves "bodily contact" as a "purpose or major activity" of the sport, 7 C.F.R. § 15a.450(b), not a risk of injury, and the existence of the latter does not necessarily imply the existence of the former. Cycling and competitive shooting, for example, both involve wearing safety equipment to guard against serious injury, but it hardly follows that they are contact sports. *See, e.g.*, Int'l Shooting Sport Fed'n, *General Technical Rules* 229 (Jan. 2020) (urging use of eye and hearing protection); USA Cycling, *2020 Rule Book* 29 (Jan. 2020) (requiring a helmet in all cycling events).

### III.

For the reasons explained above, we conclude that the maintenance of separate boys and girls divisions in the South Dakota 4-H rodeo program satisfies the competitive-skill exception to the Title IX implementing regulations, but not the contact-sport exception. 7 C.F.R. § 15a.450(b).

HENRY C. WHITAKER
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
